**Robert J. BANDONI et al.**

v.

**STATE of Rhode Island et al.**[1]

**No. 95–563–Appeal.**

Supreme Court of Rhode Island.

July 21, 1998.

---

1. During the pendency of this appeal the plaintiffs filed a motion to remove the name Robert C. Harrall from the caption of this case as party-defendant. On April 23, 1998, we granted their request and substituted the State of Rhode Island.

Marty C. Marran, Cranston, for Plaintiff.

William Mark Kolb, Assistant Attorney General, Kathleen M. Powers, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

In 1983 the Rhode Island General Assembly enacted the Victim's Bill of Rights, codi-fied in G.L.1956 chapter 28 of title 12. Three years later, the delegates to the 1986 Constitutional Convention ratified article 1, section 23, entitled "Rights of victims of crime," as an amendment to Rhode Island's Constitution. It is significant that neither the legislation nor the amendment provides for monetary damages in the event that officials charged with notifying crime victims of their rights fail to do so. Hence this case presents for our consideration a novel legal issue: does a cause of action for monetary damages accrue against state or municipal officers, in either their official or their individual capacities, when these officers fail to notify crime victims of their statutory and/or constitutional rights?[2] Although we remain sympathetic to crime victims and in no way condone the officials' failure to notify victims of their rights, we are of the opinion that the Legislature, and not this Court, is the proper branch of government to address the plethora of issues presented by this type of situation. Accordingly we affirm the judgment of the trial justice to dismiss the plaintiffs' complaint for failure to state a claim upon which relief may be granted.

## I

### Factual History[3]

■ On August 1, 1992, Robert J. Bandoni (Robert) was operating a motorcycle in the town of Coventry with his wife Lorraine as his passenger. The Bandonis' evening, however, was tragically cut short when they were struck by a truck operated by Robert

2. Following oral argument, the plaintiffs filed a supplemental memorandum urging this Court to recognize a cause of action for monetary damages "as the only viable remedy in this particular instance," as opposed to other potential remedies discussed during oral argument. With this memorandum we deem the plaintiffs to have waived our consideration of other remedies, and we shall therefore limit our discussion to whether they have stated a cause of action for monetary damages as requested. At this early juncture we note that the dissent refuses to take the plaintiffs at their word and vehemently disagrees with our conclusion on this matter. We shall address these comments *infra* § IV. A.

3. When reviewing a trial justice's judgment to grant a motion to dismiss a plaintiff's complaint for failure to state a claim upon which relief may be granted, this Court assumes that allegations contained in the complaint are true and views the facts in the light most favorable to the non-moving party. *See St. James Condominium Association v. Lokey*, 676 A.2d 1343, 1346 (R.I.1996). Therefore, this section contains the relevant alle-

L. Richardson, Jr. (Richardson). Lorraine was thrown clear of the wreckage and suffered only minor injuries. Unfortunately, Robert sustained serious injuries, including a shattered left leg and pelvis. Richardson was arrested at the scene and charged with driving while intoxicated. A subsequent chemical analysis confirmed that Richardson's blood-alcohol content was more than twice the legal limit. Thereafter, on August 5, 1992, Lorraine contacted the Coventry police to give a statement concerning the accident. It was at this time that Lorraine requested and received assurances that she and Robert would be kept apprised of the pending criminal case against Richardson. As the Bandonis would later learn, however, the criminal case against Richardson proceeded quickly and without their knowledge.

On August 12, 1992, Richardson was arraigned in the Third Division District Court and charged with one count of driving while intoxicated. Later, on September 23, 1992, also without the Bandonis' knowledge, Richardson appeared at a pretrial conference where he negotiated a plea bargain whereby he was permitted to enter a plea of *nolo contendere* to a reduced charge of "reckless driving and other offenses against public safety." Richardson's sentence included one year's unsupervised probation with no loss of license, and a $250 contribution to the Victims' Indemnity Fund, and he was ordered to pay court costs.

In preparation for a civil lawsuit against Richardson, the Bandonis retained counsel to investigate and pursue their claim. It was at this time that the Bandonis first learned that the criminal case against Richardson had been resolved without an opportunity for them to address the court. Pursuant to G.L. 1956 § 45-15-5, the Bandonis filed a claim with the town of Coventry, arguing that town officials had disregarded their statutory and constitutional duties by failing to have advised the Bandonis of their rights as crime victims. After the town council rejected this

gations that the Bandonis aver in their amended

claim, the Bandonis filed a two count complaint, later amended to three counts, against the town of Coventry, the State of Rhode Island, and the agents of these entities, (collectively defendants), asserting that had they been advised of Richardson's court dates, they would have, *inter alia,* objected to the plea bargain and requested restitution from Richardson.

Counts 1 and 2 alleged a common law negligence theory against the state and the town for defendants' failure to notify the Bandonis of the pending criminal case against Richardson. In addition, Count 3 set forth that a cause of action for monetary damages emanates directly from article 1, section 23, of the Rhode Island Constitution. Following the submission of memoranda, the trial justice granted defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure for failure to state a claim upon which relief may be granted.

On appeal the Bandonis proceed under both negligence and constitutional deprivation theories to recover monetary damages for defendants' failure to notify them of their rights as crime victims. In doing so, the Bandonis propose that they be allowed to conduct a mini-trial in which they would address a Superior Court trial justice and present the victim's impact statement that they should have been able to present at Richardson's pretrial conference. The Bandonis argue that if after hearing their statements the trial justice determines that a reasonable District Court judge would have ordered restitution, then such amount would be the measure of their damages. We, however, respectfully decline to recognize either claim.

II

## Negligence Claim

The Bandonis argue that they have established a *prima facie* case of common law negligence by demonstrating that both the Victim's Bill of Rights legislation and the victims' rights constitutional amendment place affirmative duties on defendants to ap-

complaint.

prise crime victims of their rights. The Bandonis contend that defendants' inexcusable failure to comply with these duties constitutes a breach requiring monetary damages to compensate them for their injuries. We do not agree. Among the statutory rights allegedly violated were G.L.1956 §§

"12–28–3. **General rights.**—(a) * * *

(15) To be informed by the prosecuting officer of the right to request that restitution be an element of the final disposition of a case."

"12–28–4.1. **Right to address court regarding plea negotiation.**—

(a) Prior to acceptance by the court of a plea negotiation and imposition of sentence upon a defendant who has pleaded nolo contendere or guilty to a crime, the victim of the criminal offense shall, upon request, be afforded the opportunity to address the court regarding the impact which the defendant's criminal conduct has had upon the victim."

"12–28–4.3. **Pretrial conferences—Misdemeanors in district court.**—

(a) In all misdemeanor cases heard before the district court, the victim of the alleged criminal offense shall be afforded the opportunity to address the court during the pretrial conference * * *. At the pretrial conference, the victim shall be afforded the opportunity to explain the impact which the defendant's criminal conduct has had upon the victim and to comment on the proposed disposition of the case."

"12–28–5.1. **Restitution.**—

When the court orders a defendant to make financial restitution to the victim of a crime of which the defendant has been convicted or to which the defendant has pleaded guilty or nolo contendere, a civil judgment shall automatically be entered by the trial court against the defendant on behalf of the victim for that amount."

■ It is well settled in this jurisdiction that when the language of a statute is unambiguous and expresses a clear and sensible meaning, this Court must interpret the statute literally and must give the words of the statute their plain and obvious meaning. *See, e.g., Wayne Distributing Co. v. Rhode Island Commission For Human Rights,* 673 A.2d 457, 460 (R.I.1996). Furthermore, when a statute establishes rights not cognizable at common law, that statute is "subject to strict construction." *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1226 (R.I.1996).

■ In this case the Bandonis concede, as they must, that a duty requiring crime victims to be notified of their rights did not exist at common law. Indeed, in Rhode Island it was not until the enactment of the Victim's Bill of Rights in 1983 that these rights first became cognizable. *See* P.L. 1983, ch. 265, § 1. Furthermore, the Victim's Bill of Rights is entirely devoid of any provision providing for civil liability because of an official's failure to inform crime victims of their rights. Since the General Assembly did not establish a cause of action in negligence, the Bandonis essentially ask us to create a private cause of action by judicial rule. "We have long held, however, that the creation of new causes of action is a legislative function." *Accent Store Design, Inc.,* 674 A.2d at 1226; *Ferreira v. Strack,* 652 A.2d 965, 968 (R.I.1995) (citing *Kalian v. People Acting Through Community Effort, Inc. (PACE),* 122 R.I. 429, 432, 408 A.2d 608, 609 (1979)). Therefore, in the absence of such a provision, we must exercise our judicial restraint in declining to divine the Legislature's intent. *See In re John,* 605 A.2d 486, 488 (R.I.1992) ("because the statute does not plainly provide for a private cause of action, such a right cannot be inferred"); *Knutson v. County of Maricopa,* 175 Ariz. 445, 857 P.2d 1299, 1300 (Ct.App.1993) (refusing to create a cause of action in negligence where prosecutor failed to notify a crime victim of a hearing pursuant to a court rule); *Bruegger v. Faribault County Sheriff's Department,* 497 N.W.2d 260, 262 (Minn.1993) (holding that since no common law duty required officials to inform crime victims of their right to receive financial compensation, and because the Legislature failed to provide a remedy, *no cause of action exists*). This is particularly true when, as here, the General Assembly was well aware of the issue of noncompliance,

*see* § 12–28–7,[4] had numerous opportunities to provide for a cause of action, *see, e.g.,* P.L.1994, ch. 187, § 1, and yet did not provide crime victims with a cause of action.

To inject a judicial remedy at this time into a statute that plainly does not contain a remedy, particularly when there is no evidence to suggest that the Legislature had intended to create a cause of action, "would be interpretation by amendment." *Rhode Island Federation of Teachers, AFT, AFL–CIO v. Sundlun,* 595 A.2d 799, 802 (R.I.1991). In the event the Legislature should choose to create such a remedy, there is no question that it has the capacity to do so at any time. *See id.* But it is not the function of this Court to act as a super legislative body and rewrite or amend statutes already enacted by the General Assembly. *See id.; Ellis v. Rhode Island Public Transit Authority,* 586 A.2d 1055, 1060 (R.I.1991); *New England Die Co. v. General Products Co.,* 92 R.I. 292, 298, 168 A.2d 150, 154 (1961).

Therefore, whatever the merits of the Bandonis' claim may be, we are of the opinion that principles of judicial restraint prevent us from creating a cause of action where a duty to apprise crime victims of their rights did not exist at common law and where our Legislature has neither by express terms nor by implication provided for civil liability. *See Accent Store Design, Inc.,* 674 A.2d at 1226. *See also Knutson,* 857 P.2d at 1300–01; *Bruegger,* 497 N.W.2d at 262. Having concluded that a cause of action for damages does not lie in negligence, we next address the Bandonis' second argument that a cause of action may be derived directly from the victims' rights amendment itself.

## III

### Constitutional Tort Claim

In 1986 delegates to the Constitutional Convention amended Rhode Island's Constitution to include article 1, section 23, entitled "Rights of victims of crime." This amendment, like its previously enacted statutory counterpart, appears to ensure that victims are entitled to receive financial compensation from the perpetrator of the crime and are to be given an opportunity to make a victim's impact statement before the court. Today twenty-eight other states have enacted similar provisions,[5] each guaranteeing its crime victims constitutionally protected rights, while other jurisdictions, including the Federal Government, are presently debating similar constitutional amendments. It is significant, however, that none of these state constitutions, including Rhode Island's, explicitly provides a cause of action for damages in the event that officials who are charged with informing crime victims of their rights fail to comply. Instead these states are split with approximately one-half expressly providing that an official's noncompliance will not result in a cause of action for damages and/or the right to vacate an otherwise lawful conviction,[6] and the other half

---

4. General Laws 1956 § 12–28–7 states:
 "**Noncompliance not affecting validity of conviction, sentence, or parole.**—Failure to afford the victim of a felony offense any of the rights established by this chapter shall not constitute grounds for vacating an otherwise lawful conviction, or for voiding an otherwise lawful sentence or parole determination."

5. *See* Ala. Const. amend. 557; Alaska Const. art. I, § 24; Ariz. Const. art. 2, § 2.1; Cal. Const. art. 1, § 28; Colo. Const. art. 2, § 16a; Conn. Const. art. 1, § 8; Fla. Const. art. 1, § 16(b); Idaho Const. art. 1, § 22; Ill. Const. art. I, § 8.1; Ind. Const. art. 1, § 13(b); Kan. Const. art. 15, § 15; Md. Decl. of Rights art. 47; Mich. Const. art. 1, § 24; Mo. Const. art. I, § 32; Neb. Const. art. I, § 28; Nev. Const. art. 1, § 8; N.J. Const. art. 1, § 22; N.M. Const. art. II, § 24; N.C. Const. art. I, § 37; Ohio Const. art. I, § 10a; Okla. Const. art. 2, § 34; Oreg. Const. art. 1, § 42; S.C. Const. art. I, § 24; Tex. Const. art. 1, § 30; Utah Const. art. I, § 28; Va. Const. art. I, § 8–A; Wash. Const. art. I, § 35; Wis. Const. art. 1, § 9m.

6. *See, e.g.,* Nev. Const. art. 1, sec. 8(3) ("[N]o person may maintain an action against the state or any public officer or employee for damages or injunctive, declaratory or other legal or equitable relief on behalf of a victim of a crime as a result of a violation of any statute enacted by the legislature pursuant to subsection 2. No such violation authorizes setting aside a conviction or sentence or continuing or postponing a criminal proceeding"); Utah Const. art. 1, sec. 28(2) ("Nothing in this section shall be construed as creating a cause of action for money damages, costs, or attorney's fees, or for dismissing any criminal charge, or relief from any criminal judgment"). *See also* Proposed Amendment to the Constitution of the United States to protect rights of crime victims, H.J. Res. 71, 105th Cong.

falls into a category in which their constitutions, like Rhode Island's, are either silent on this issue or have left an enforcement provision to the discretion of their Legislatures.[7] Since neither Rhode Island's Constitution nor its Victim's Bill of Rights legislation expressly provide a cause of action for damages, the Bandonis aver that this Court should recognize a constitutional tort action directly from article 1, section 23, of the Rhode Island Constitution for the reasons articulated in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

### A. The Bandonis' Constitutional Tort Argument

In *Bivens* the United States Supreme Court created a cause of action for damages as a result of federal officials' violating a citizen's rights under the Fourth Amendment, despite the fact that neither the United States Code nor the Fourth Amendment expressly provide for such a remedy. *Id.* at 397, 91 S.Ct. at 2005, 29 L.Ed.2d at 627. Analogizing the present case to *Bivens*, the Bandonis argue that this Court should create a state *Bivens* action for the injuries suffered as a result of state and municipal officials' failure to notify them of their state constitutional rights.[8]

Before reaching the Bandonis' claim, however, we must first address the threshold question of whether article 1, section 23, is self-executing; in other words, does the victims' rights amendment supply " 'a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed be enforced * * * [or does] it merely indicate[ ] principles, without laying down rules by means of which those principles may be given the force of law[?]' " *Davis v. Burke*, 179 U.S. 399, 403, 21 S.Ct. 210, 212, 45 L.Ed. 249, 251 (1900).[9] Because we con-

§ 2 ("[N]othing in this article shall provide grounds for the victim to overturn a charging decision, a conviction, or a sentence; to obtain a stay of trial; or to compel a new trial. Nothing in this article shall give rise to any claim for damages, nor provide grounds for the accused or convicted offender to obtain any form of relief"); S.J. Res. 6, 105th Cong. § 2 (substantially similar).

7. *See, e.g.,* Mich. Const. art. 1, sec. 24(2) ("The legislature may provide by law for the enforcement of this section"); Neb. Const. art. 1, sec. 28 ("The legislature shall provide by law for the implementation of the rights granted in this section. There shall be no remedies other than as specifically provided by the Legislature for the enforcement of the rights granted by this section").

8. As the dissent observes, the United States Supreme Court has subsequently extended the *Bivens* action to include a monetary cause of action for violations of the Fifth Amendment's due process clause, *see Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and for violations of the Eighth Amendment's cruel and unusual punishment clause. *See Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). In the eighteen years since *Davis* and *Carlson*, however, the Court has dramatically curtailed its holding in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See Federal Deposit Insurance Corp. v. Meyer*, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (refusing to extend *Bivens* actions to Federal Government agencies); *Schweiker v.*

*Chilicky*, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (declining to imply a *Bivens* action for alleged due process violations for the denial of Social Security disability benefits on the ground that a damages remedy was not included in the remedial scheme devised by Congress); *United States v. Stanley*, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (declining *Bivens* action while reaffirming *Chappell* ); *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (refusing to permit federal employee a damages cause of action for alleged First Amendment violation arising out of an employment relationship on the grounds that civil service damages are available and that Congress is better suited to create new remedies); *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (refusing to create a *Bivens* action for enlisted military personnel alleging deprivation of certain rights even though no other remedy available). *See also Meyer*, 510 U.S. at 484, 114 S.Ct. at 1005, 127 L.Ed.2d at 322 ("In our most recent decisions, we have 'responded cautiously to suggestions that *Bivens* remedies be extended into new contexts' "); *Kelley Property Development, Inc., v. Town of Lebanon*, 226 Conn. 314, 627 A.2d 909, 921 (1993) (recognizing the Supreme Court's retreat); *Brown v. State*, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1138 (1996) (same).

9. We stress, as the dissent acknowledges, that the overarching question presented by this case is whether article 1, section 23, is self-executing. Until we determine that this provision is self-executing, any discussion concerning the Bandonis' potential remedies is entirely superfluous

clude that article 1, section 23, represents the latter *Davis* principle, we find it unnecessary to reach the second question concerning whether this Court should recognize a cause of action for damages derived directly from the victims' rights amendment.

## B. *Is Article 1, Section 23, Self–Executing?*

Article 1, section 23, Rhode Island's victims' rights amendment states:

> "A victim of crime shall, as a matter of right, be treated by agents of the state with dignity, respect and sensitivity during all phases of the criminal justice process. Such person shall be entitled to receive, from the perpetrator of the crime, financial compensation for any injury or loss caused by the perpetrator of the crime, and shall receive such other compensation as the state may provide. Before sentencing, a victim shall have the right to address the court regarding the impact which the perpetrator's conduct has had upon the victim."

To determine whether a particular constitutional provision is self-executing, many jurisdictions begin their analysis with the standard adopted by the United States Supreme Court in *Davis, supra:*

> " 'A constitutional provision may be said to be self-executing *if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced;* and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.' * * * In short, if complete in itself, it executes itself." *Davis,* 179 U.S. at 403, 21 S.Ct. at 212, 45 L.Ed. at 251–52. (Emphasis added). *See, e.g., Shields v. Gerhart,* 163 Vt. 219, 658 A.2d 924, 928 (1995).

From this model additional standards have evolved to facilitate the determination of whether a particular provision is self-executing. Among those that we find helpful are the guidelines recently enunciated by the Vermont Supreme Court:

> "First, a self-executing provision should do more than express only general principles; it may describe the right in detail, *including the means for its enjoyment and protection.* * * * [Second, o]rdinarily a self-executing provision does not contain a directive to the legislature for further action. * * * [Third, t]he legislative history may be particularly informative as to the provision's intended operation. * * * Finally, a decision for or against self-execution must harmonize with the scheme of rights established in the constitution as a whole." *Shields,* 658 A.2d at 928 (citing *Convention Center Referendum Committee v. Board of Elections and Ethics,* 399 A.2d 550, 552 (D.C.Ct.App.1979)). (Emphasis added.)

Using the Vermont Supreme Court's standard to outline our discussion, we are of the opinion that since article 1, section 23, expresses only general principles, and does not supply a sufficient rule of law by which even these general rights may be enjoyed, protected, or enforced, we must conclude that this provision is not self-executing.

### 1. *The First Criterion*

The first criterion requires us to consider whether the victims' rights amendment articulates specifically enforceable rights, including the means by which these rights may be enjoyed or protected, or whether it merely espouses general principles. *See Shields,* 658 A.2d at 928. The Bandonis concede that the first sentence of the victims' rights amendment is only a general statement of principle containing neither concrete rights nor a means by which these rights may be enjoyed or protected. The Bandonis assert, however, that specific fundamental rights are articulated in the remaining two sentences of the amendment and consequently, the amendment is indicative of a self-executing provision. We must disagree.

---

since, as a matter of law, the victims' rights amendment does not provide " 'a sufficient rule by means of which the right given may be enjoyed and protected.' " *Davis v. Burke,* 179 U.S. 399, 403, 21 S.Ct. 210, 212, 45 L.Ed. 249, 251

(1900). Since this issue is the pivotal question upon which this appeal turns, we are surprised to find the analysis on this point buried in the later portions of the dissent. *See infra* footnote 19.

In determining whether the first criterion is satisfied, we scrutinize the amendment for detail and precision. *See Convention Center Referendum Committee,* 399 A.2d at 552. Upon doing so, we are struck by the amendment's broad scope and utter lack of any means by which these rights may be enjoyed, protected, or enforced. We focus on two factors.

### a. Article 1, Section 23, Mirrors the "Legislative Purpose" Provision

When delegates to the Constitutional Convention gathered in 1986, the Victim's Bill of Rights legislation was three years old and had been already amended to provide crime victims with fourteen (now fifteen) general rights. *See* P.L.1985, ch. 411, § 1. Furthermore, the 1986 version of the Victim's Bill of Rights provided in explicit terms the means by which some of these rights could be protected and enjoyed. For example, one general right guaranteed crime victims the right "to address the court prior to sentencing in those cases where the defendant has been adjudicated guilty following a trial," § 12–28–3(11), but, § 12–28–4 provided the precise means by which this particular right may be enjoyed, stating that the victim's statement be made "prior to counsel for the state and the defendant making their sentencing recommendations," and before the defendant is permitted to exercise his or her own right of allocution. *See* § 12–28–4. *See also* § 12–28–4.1 (extending similar right to crime victims when the defendant has pleaded *nolo contendere* or guilty to a crime). Another general right, although enacted after the 1986 Convention, guaranteed that victims be informed of their right to request that restitution be an element of the final disposition. *See* § 12–28–3(15). However, § 12–28–5, which was in force prior to the Convention, provided that upon the defendant's conviction of a felony, a civil judgment shall automatically enter in favor of the victim conclusively establishing the defendant's liability. Furthermore, this section also required the court to notify the victim at his or her last known address of the entry of a civil judgment in his or her favor and inform the victim that he or she must establish proof of damages in an appropriate judicial proceeding. *See id.*

In spite of the fourteen general rights set forth in § 12–28–3, as well as the more specific means that other provisions of the Victim's Bill of Rights statute established, all of which were enacted prior to the 1986 Constitutional Convention, the framers elected to model article 1, section 23, after the much broader Legislative Purpose provision of § 12–28–2. Indeed, the language utilized in article 1, section 23, is almost identical to § 12–28–2, in which the General Assembly declared its intent to ensure that crime victims are treated with dignity, respect, and sensitivity, and whenever possible, receive financial compensation from the perpetrators of the crimes, and that the crimes' impact on the victims be brought to the courts' attention.

The fact that § 12–28–2 does not provide a procedural means by which crime victims may enjoy or protect their rights is not surprising since these means are provided by other sections of the Victim's Bill of Rights. However, the fact that the framers chose to model the victims' rights amendment from the broad contours of § 12–28–2's Legislative Purpose provision, knowing full well that other sections within chapter 28 contained more specific rights as well as the means by which these rights may be enjoyed and protected is highly persuasive to our conclusion that article 1, section 23, espouses only general principles and is therefore not self-executing.

■ Our conclusion is supported by even the most rudimentary comparison of § 12–28–2 with the victims' rights amendment. Section 12–28–2 provides in its entirety that

"In recognition of the responsibility of the community to the victims of crime, the general assembly declares its intent to ensure:

(1) That all crime victims are treated with dignity, respect, and sensitivity at all phases of the criminal justice process;

(2) That whenever possible they receive financial compensation for their injury or loss from the perpetrator of the crime; and

(3) That the full impact of the crime upon the victim is brought to the attention of the court."

After comparing this section to the victims' rights amendment,[10] the only discernible difference is that article 1, section 23, is expressed in mandatory terms.. This factor, however, does not influence our conclusion since a constitutional provision may be expressed in mandatory terms and still not be self-executing. *See* 16 Am.Jur.2d. *Constitutional Law* § 98 at 486 (1998).

The dissent concludes that article 1, section 23, establishes specific individual rights and points to the last sentence of section 23 for support. This last sentence provides, "[b]efore sentencing, a victim shall have the right to address the court regarding the impact which the perpetrator's conduct has had upon the victim."

To support this self-executing conclusion, the dissent notes our supposedly "conspicuous[ ] omi[ssion of] this latter right [in our conclusion] that the constitutional framers 'chose to model' the victims' rights amendment after the broader Legislative Purpose provision of the Victim's Bill of Rights Act, which (unlike article 1, section 23) neither places a specific right to address the court in the hands of a victim nor details when this right may be enjoyed." However, a closer inspection of the "General rights" provision, if not the "Legislative Purpose" provision itself ("the general assembly declares its intent to ensure: * * * (3) That the full impact of the crime upon the victim is brought to the attention of the court"[11]), § 12–28–2(3), reveals that crime victims had *already* been given the right to address the court prior to sentencing three years *before* article 1, sec-

tion 23, was ever ratified. *See* § 12–28–3(11), as enacted by P.L.1983, ch. 265, § 1 ("To be afforded the right to address the court prior to sentencing in those cases where the defendant has been adjudicated guilty following a trial"). *See also* § 12–28–4 (providing the precise procedures by which crime victims can exercise their right to address the court before sentencing). Therefore, contrary to the dissent's assertion, article 1, section 23, provides crime victims with no additional rights beyond those promulgated by the General Assembly in 1983.

**b. Framers' Failure to Provide Crime Victims with a Remedy**

Furthermore, we note that the victims' rights amendment does not expressly provide a cause of action for damages. While the absence of a remedy does not *ipso facto* defeat the Bandonis' contention that article 1, section 23, is self-executing, it is an additional indication that the victims' rights amendment does not provide a sufficient rule by which the rights given may be enjoyed or protected. *See Shields*, 658 A.2d at 929. The Bandonis' argument that the true intent of the framers was to provide a cause of action for damages would be more persuasive were we presented with evidence demonstrating that the framers simply overlooked the issue of noncompliance or enforcement. On the contrary, while drafting the amendment the framers had the benefit of considering § 12–28–7. This section provides that "[f]ailure to afford the victim of a felony offense any of the rights established by [the Victim's Bill of Rights] shall not constitute grounds for vacating an otherwise lawful conviction, or for voiding an otherwise lawful sentence or parole determination." Section 12–28–7.

10. Similar to § 12–28–2, the victims' rights amendment states:

"A victim of crime shall, as a matter of right, be treated by agents of the state with dignity, respect and sensitivity during all phases of the criminal justice process. Such person shall be entitled to receive, from the perpetrator of the crime, financial compensation for any injury or loss caused by the perpetrator of the crime, and shall receive such other compensation as the state may provide. Before sentencing, a victim shall have the right to address the court regarding the impact which the perpetrator's

conduct has had upon the victim." R.I. Const. art. 1, sec. 23.

11. Indeed, the reason behind the Legislature's failure explicitly to provide crime victims with the right to address the court *before* sentencing may have been nothing more than its realization that in the normal course of events "the full impact of the crime upon the victim is brought to the attention of the court" prior to sentencing, rather than after the defendant has already been led away in handcuffs. Thus the Legislature may have simply concluded that including the words "before sentencing" was superfluous.

Clearly this section raises the specter of noncompliance.

It is equally apparent that not only could the framers have provided for an enforcement mechanism, they in fact debated doing so and in the end declined to provide such a provision in article 1, section 23. An early version of a proposed constitutional amendment, which was not ratified, contained the following provision:

"SECT. 2. ENFORCEMENT OF SUCH RIGHTS. A victim of crime whose complaint is filed in and brought before any Court of the State of Rhode Island shall have the independent right to sue at law, in equity or by any other proper proceeding to compel compliance with the aforesaid rights provided in Section 1 of this Amendment and the Court hearing such suit may in its discretion allow said victim bringing such suit to recover a reasonable attorney's fee."

Another version of a proposed amendment (Resolution 86–140), was sent to the Committee on Style and Drafting, stating that "[t]hese rights shall be enforceable by the victims of crime and they shall have recourse in the law for any denial thereof." The committee, however, struck out this last sentence, and Resolution 86–140 was subsequently ratified to become article 1, section 23.

The Bandonis ask us to ignore the final version of article 1, section 23, arguing that notwithstanding the fact that the enforcement provision was struck down by the Committee on Style and Drafting, the framers' intent was eminently clear that a crime victim should be able to enforce these rights through a cause of action for monetary damages. But in order for this argument to have any merit, we would have to disregard our well-established rules of construction, which provide that "[e]very clause of the constitution * * * be given its due force, meaning, and effect, and [that] no word or section can be assumed to have been unnecessarily used, or needlessly added," *City of Pawtucket v. Sundlun,* 662 A.2d 40, 45 (R.I. 1995), or unnecessarily omitted. Instead we must assume that the framers carefully weighed and considered the words in each clause and intended those terms to imply a definite meaning. *See id.*

Like the Bandpmos, the dissent also looks beyond the clear and unambiguous words of article 1, section 23, and directs our attention to the Constitutional Convention's history wherein the dissent contends the framers "in fact intended for victims to have enforceable rights in the courts." Because the dissent purports to have reached this conclusion after having examined primary sources, we find it necessary to respond in detail to offset any suggestion that we have taken liberties with the historical record in this case. We simply view the following historical events in a different light, colored by long-standing and traditional precepts of constitutional interpretation.

The dissent contends that Resolution 86–140 was resoundingly approved (minus the language providing for a remedy, of course) "only after the delegates were assured that the style committee's changes were made only 'for the economy of language.' " As we shall demonstrate, however, neither the record in this case nor the case law the dissent cites actually supports this theory.

First, we have great difficulty agreeing that the Committee on Style and Drafting "altered" the text of Resolution 86–140 but only "for the economy of language." To demonstrate our point, we have reproduced the changes (both additions and deletions) that the Committee on Style and Drafting made to Resolution 86–140 after its initial passage on the floor of the Convention. As demonstrated below, whatever the reasoning for the committee's changes may have been, the rationale of "economy of language" is not cogently supported.[12]

---

12. We are constrained to note that had the framers truly intended to alter the text and to do so solely for the purpose of "economy of language," the framers did so by the narrowest of margins. An examination of the alterations made by the Committee on Style and Drafting reveals that thirty-three words were added to Resolution 86–140, whereas thirty-four words were deleted. Thus the framers accomplished their supposed goal of economizing the language of the soon-to-be article 1, section 23, by a grand total of *one word.*

"Sec. 24. VICTIMS' RIGHTS.—~~All persons within this state who are~~ A victims of crime shall, as a matter of right, be treated by agents of the state with dignity, respect and sensitivity during all phases of the criminal justice process. ~~Whenever possible,~~Such persons shall be entitled to receive, from the perpetrator of the crime, financial compensation for ~~their~~ any ~~injuriesy~~ or losses caused by ~~from~~ the perpetrator of the crime, and shall receive such other compensation as the state may provide. ~~They~~ Before sentencing, a victim shall have the right to address the court regarding the impact which the perpetrator's conduct has had upon the victim. ~~These rights shall be enforceable by the victims of crime and they shall recourse in the law for any denial thereof.~~"

Likewise, it is equally apparent that the deletion of the last sentence expressly providing that crime victims "shall have recourse in the law" and substituting for it the clause "such other compensation as the state may provide" is nothing short of a substantive alteration. Thus, it is not only the *deletion* of the language providing for "recourse in the law for any denial" of rights that is of moment to our analysis but also the *inclusion* of the language "and shall receive such other compensation as the *state* may provide." (Emphasis added.) Practically speaking, it is impossible for the Bandonis to "receive such other compensation as the state may provide," as article 1, section 23, contemplates, because the state itself has not provided for "such other compensation." On this issue even the dissent acknowledges that the state "has not acted to give victims remedial protection when they are deprived of their [rights]." Other courts are in accord with this reasoning. For instance, in *State v. Rodrigues*, 63 Haw. 412, 629 P.2d 1111, 1114 (1981), the Hawaii Supreme Court construed the phrase "as provided by law" in its constitution "as a direction to the legislature to enact implementing legislation." *See also Wann v. Reorganized School of District No. 6 of St. Francois County*, 293 S.W.2d 408, 411 (Mo.1956) (the phrase "as provided by law" "lays down only a general principle and directs the legislature to provide the rules by which the general right which it grants may be enjoyed and protected. In other words, *it is clear that subsequent action by the legislature is contemplated to put the provision into operation* "). (Emphasis added.) We are of the opinion that considering the framers' decision to provide crime victims with "such other compensation as the state may provide," knowing that neither the Constitution nor the General Laws provide crime victims with such other compensation, the real separation-of-powers violation that the dissent alludes to would be for this Court to create a remedy.

To support the conclusion that article 1, section 23, is self-executing, the dissent relies on two textually identical *secondary* sources for the proposition that the framers intended to mandate enforcement "while leaving specific provisions or mechanisms to the determination of the general assembly *and the courts.*" However, simply stated, these two sources incorrectly cite to the Constitutional Convention's Judiciary Committee report. Indeed, the report only states its resolve "to *mandate* enforceability while leaving the creation of specific provisions or mechanisms to the General Assembly." *See* Report of the Judiciary Committee Relating to Victims of Crime Resolution (86–140) at 5. Not once throughout its entire report does the Judiciary Committee ever mention, or even imply, that the creation of specific provisions or mechanisms should also be left to the courts. The record simply does not support this conclusion.

In addition we also have trouble accepting the dissent's conclusion that Resolution 86–140 was approved "only after the delegates were assured that the style committee's changes were made only 'for the economy of language.' " Our review of the Convention proceedings finds no such "assurances," promises, or even any inquiry from the floor about the modifications to Resolution 86–140. Instead our inspection finds only a reading of the proposed amendments with Resolution 86–140 being introduced by the words that "[t]his resolution on victim[s'] rights was redrafted for the economy of language and it now reads as follows." From this single sentence the dissent surmises that delegates received explicit assurances that Resolution

86–140 was modified only for the purpose of economy of language and that no other substantive changes were made. On the contrary, when the Convention president introduced Resolution 86–140, he prefaced the voting by stating:

"Essentially, this adds a section to the constitution requiring that victims of crime shall, as a matter of right be treated by the agents of the State with dignity and respect and sensitivity during all phases of the criminal justice process. Such person shall be entitled to receive from the perpetrator of crime financial compensation for any injury or loss caused by the perpetrator of the crime and shall receive such other compensation as the State may provide. Before sentencing a victim shall have the right to address the court regarding the impact which the perpetrator's conduct has had upon the victim. That is Resolution 86–140, *as amended.*" (Emphasis added.)

Moments after the president's reading of amended Resolution 86–140, delegates overwhelmingly passed this version of Resolution 86–140 (without the recourse in law language) by a margin of ninety-three to one.

However, even if the delegates did receive explicit assurances as the dissent suggests, statements by individual legislators or framers are not to be given talismanic significance. *See Brock v. Pierce County,* 476 U.S. 253, 263, 106 S.Ct. 1834, 1840, 90 L.Ed.2d 248, 257 (1986). On this point we find the recent opinion of the First Circuit Court of Appeals in *State of Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685 (1st Cir. 1994), to be particularly instructive.

In *Narragansett Indian Tribe* the First Circuit Court of Appeals was faced with the question of whether Congress intended the newly enacted Indian Gaming Regulatory Act to repeal the jurisdiction granted a decade earlier in the Rhode Island Claims Settlement Act, thereby subjecting the Narragansett Indians to the civil, criminal, and regulatory laws of the State of Rhode Island. In a manner reminiscent of the dissent's two-pronged approach, the state in *Narragansett Indian Tribe* argued (1) that the preliminary version of the gaming act contained a provision safeguarding the settlement act's grant of jurisdiction from implied repeal (safeguarding provision) and (2) that despite the fact that the safeguarding provision was deleted prior to the gaming act's final passage, Rhode Island's Senators received explicit assurances from the bill's sponsor and floor manager that the settlement act's grant of jurisdiction would not be repealed. *Id.* at 698. The record supports the state's assertions and establishes that the following colloquy took place on the floor of the United States Senate:

"Mr. PELL. * * * *In the interests of clarity,* I have asked that language specifically citing the protections of the Rhode Island Claims Settlement Act (Public Law 95–395) be stricken from S.555 [the Indian Gaming Regulatory Act]. I understand that these protections clearly will remain in effect.

"Mr. INOUYE. I thank my colleague, the senior Senator from Rhode Island [Mr. Pell], and *assure* him that the protections of the Rhode Island Claims Settlement Act (P.L. 95–395), will remain in effect and that the Narragansett Indian Tribe clearly will remain subject to the civil, criminal, and regulatory laws of the State of Rhode Island.

"Mr. CHAFFEE. Mr. President, I too would like to thank the chairman [Mr. Inouye] * * *. The chairman's statement makes it clear that any high stakes gaming, including bingo, in Rhode Island will remain subject to the civil, criminal, and regulatory laws of our State." 19 F.3d at 698. (Emphases added.)

Despite the explicit assurances in *Narragansett Indian Tribe,* the First Circuit had little trouble rejecting the state's claims since "[i]n the game of [constitutional] interpretation, [constitutional] language is the ultimate trump card." *Id.* at 699. Likewise, in the case at bar, we too have little trouble rejecting the purported assurances raised by the dissent. The simple, and indeed unmistakable, fact is that when the constitutional framers decided to add article 1, section 23, to our Constitution, they did so by means of an exercise that requires putting pen to pa-

per. As the First Circuit articulated in rejecting an argument similar to the dissent's:

> "Once Congress has spoken, it is bound by what it has plainly said, notwithstanding the nods and winks that may have been exchanged in floor debates and committee hearings. After all, it is not the proper role of legislators to use unwritten assurances or side arrangements to alter the clear meaning of agreed language. And the judiciary must stand as the ultimate guarantor of the integrity of an enacted statute's text.
>
> "In sum, once Congress has spoken, a court cannot override the unambiguous words of an enacted statute and substitute for them the court's views of what individual legislators likely intended. Any other rule imports a virulent strain of subjectivity into the interpretive task and, in the process, threatens to transfer too large a slice of legislative power from Congress to the courts." 19 F.3d at 699–700.

In order for us to give primary effect to the contemporaneous words of one individual's planned remarks moments before a final vote on Resolution 86–140, we would have to turn a blind eye to our well-established rules of constitutional construction, which states that it is presumed the language in an enactment was carefully considered before it was finally adopted and "that when words in the constitution are free of ambiguity, they must be given their plain, ordinary, and usually accepted meaning." *Sundlun,* 662 A.2d at 45. This we shall not do.

Furthermore, our conclusion that the Committee on Style and Drafting made substantive amendments to Resolution 86–140 is buttressed by a source none other than the dissenting opinion. On the one hand the dissent insists the resolution was redrafted solely for the purpose of "the economy of language" and "was not intended to alter the

*substantive meaning* of Resolution 86–140." However, on the other hand, the dissent bases the conclusion that article 1, section 23, is self-executing on the ground that it establishes "a *specific* individual right" to address the court prior to sentencing. This specific individual right, however, was not in the original version of Resolution 86–140 and only found its way into the final version *after* the committee "altered" the text for "the economy of language," changes that the dissent has already told us were "not intended to alter the *substantive meaning* of Resolution 86–140."[13]

### 2. *The Second and the Third Criteria*

Turning our attention to the second and the third criteria, we note that the text of the victims' rights amendment does not contain an express directive that the General Assembly act to implement the amendment. Although the lack of a mandate would ordinarily tip the scales in favor of a conclusion that article 1, section 23, is self-executing, we do not consider the lack of a mandate surprising, considering the general nature of rights articulated in the victims' rights amendment. *See Shields,* 658 A.2d at 929. In addition, after examining the historical records memorializing the 1986 Convention, we are left with the undeniable conclusion that the framers intended to leave the enactment of an enforcement provision to the General Assembly.

By all accounts the issue of crime victims having the means to enforce their rights was a major topic of discussion and debate. Early versions of proposed constitutional amendments provided enforcement provisions. In addition, public testimony was elicited, urging that a constitutional amendment contain an enforcement provision. Even the Judiciary Committee debated the enforcement issue and concluded "that the lack of enforcement

---

**13.** We find it necessary to reiterate the fact that even though article 1, section 23, contains the right of a crime victim to address the court prior to sentencing, this inclusion alone cannot be indicative of a self-executing provision. We state this conclusion firmly and without hesitation since the Victim's Bill of Rights, § 12–28–3, entitled *"General* rights," had already provided crime victims "the right to address the court

prior to sentencing" three years before article 1, section 23, was ratified. *See* § 12–28–3(11). (Emphasis added.) Furthermore, as we have previously stated, other provisions that existed at the time of the 1986 Convention already provided the precise procedures by which crime victims may exercise this right. *See* §§ 12–28–4; 12–28–4.1.

provisions in the present statute is a major defect, and * * * therefore, resolved to *mandate* enforceability, *while leaving the creation of specific provisions or mechanisms to the General Assembly.*" *See* Report of the Judiciary Committee Relating to Victims of Crime Resolution (86–140) at 5. (Second emphasis added). Considering the committee's unanimous conclusion to leave the creation of specific enforcement provisions or mechanisms to the General Assembly, we are not surprised that the final ratified version of article 1, section 23, does not contain a provision enabling crime victims to protect and enforce their rights. By means of the Judiciary Committee's own words, we find it apparent that absent "the creation of specific provisions or mechanisms [by] the General Assembly" a private cause of action for damages was not intended. *See Goldrush II v. City of Marietta,* 267 Ga. 683, 482 S.E.2d 347, 352 (1997) (citing *State v. Pendergrass,* 63 Haw. 633, 633 P.2d 1113 (1981) and *DeKalb County v. Allstate Beer,* 229 Ga. 483, 192 S.E.2d 342 (1972)).

Although the General Assembly may have failed to heed the framers' clarion call to enact specific enforcement provisions, the legislative history illustrates that other specific measures have been created to protect crime victims. *See generally* 16 Am.Jur.2d *Constitutional Law* § 99 at 487–88 (1998) ("Even if a constitutional provision contains a mandatory requirement that the legislature adopt a particular provision, there is no remedy if the legislature fails to obey such constitutional mandate"). In particular, since the 1986 Constitutional Convention, the General Assembly has amended the Victim's Bill of Rights on seven separate occasions. Among the amendments three new sections to chapter 28 have been included, namely, § 12–28–4.3, which affords crime victims the opportunity to address the District Court during a pretrial conference regarding the impact that the defendant's conduct has had upon the victim; § 12–28–5.1, which expands

the contours of § 12–28–5 to allow a civil judgment automatically to enter in favor of the victim when the defendant has pleaded guilty or *nolo contendere;* and § 12–28–10, which establishes the creation of the victims' services unit. In addition to these newly enacted sections, other provisions of chapter 28 have been revisited and amended to provide additional protection. *See, e.g.,* P.L. 1993, ch. 413, § 1; P.L.1991, ch. 302, § 1.

Despite these measures, however, the General Assembly has failed to enact an enforcement provision even though numerous opportunities have existed to introduce such legislation. The General Assembly's failure to enact an enforcement provision, coupled with the fact it has elected to preserve § 12–28–7, which addresses the issue of noncompliance, further supports our conclusion that a private cause of action for damages was not intended by either the General Assembly or the constitutional framers.

### 3. *The Fourth Criterion*

Finally, our conclusion that the victims' rights amendment is not self-executing "must harmonize with the scheme of rights established in [our] constitution as a whole." *Shields,* 658 A.2d at 928. As the Bandonis correctly point out, there are no provisions in the Rhode Island Constitution relating to crime victims' rights other than article 1, section 23. Nevertheless, the Bandonis argue that failure to create a cause of action for monetary damages will violate article 1, section 5, of the Rhode Island Constitution.[14] The Bandonis contend that this provision provides that whenever there is a recognized right, whether statutory or constitutional, there must also be a corresponding remedy for its abridgment.

This Court, however, has never held that violating a recognized right requires monetary damages. Furthermore, even if we were to conclude that article 1, section 23, is self-executing, this fact alone would not nec-

---

**14.** Article 1, section 5, of the Rhode Island Constitution provides:

"**Entitlement to remedies for injuries and wrongs—Right to justice.**—Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which may be received in one's person, property, or character. Every person ought to obtain right and justice freely, and without purchase, completely and *without denial;* promptly and without delay; conformably to the laws."

essarily support a claim for damages. *See Figueroa v. State,* 61 Haw. 369, 604 P.2d 1198, 1206 (1979); *Brown v. State,* 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1138 (1996); *Shields,* 658 A.2d at 930. *See also* Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims, and Defenses,* § 7.05[1], at 7–14 (1995) (court may provide injunctive or declaratory relief, as opposed to the specific remedy of damages). Instead we have stated on numerous occasions that article 1, section 5, forbids the total denial of access to the courts for the adjudication of a recognized claim. *See, e.g., Kennedy v. Cumberland Engineering Co.,* 471 A.2d 195, 200 (R.I.1984) (statute requiring personal-injury claim to be commenced within ten years of the date product was first purchased, regardless of the date of injury, completely denied the plaintiff access to court). In addition, this Court has previously observed that " '[a]lthough, in a free government, every man is entitled to an adequate legal remedy for every injury done to him, yet the form and extent of it is necessarily subject to the legislative power.' In other words, the constitutional provisions are not self-executing, and require legislative assistance." *Henry v. Cherry & Webb,* 30 R.I. 13, 36, 73 A. 97, 106–07 (1909) (quoting *In the Matter of Nichols,* 8 R.I. 50, 54 (1864)).

Although we applaud the Legislature and the constitutional framers for their efforts to provide crime victims with specific rights, principles of judicial restraint prevent us from creating a cause of action for damages in all but the most extreme circumstances. The extensive discussion that we have given to this issue alone indicates the enormous danger of judicially creating a cause of action when both the constitutional framers and the members of the General Assembly had the same opportunity to create a remedy and yet declined to do so. Instead we are of the opinion that the creation of a remedy in the circumstances presented by this case should be left to the body charged by our Constitution with this responsibility. *See* R.I. Const. art. 6, sec. 1 ("The general assembly shall pass all laws necessary to carry this Constitution into effect"). In this forum the myriad complex issues presented by the imposition of liability can be fully debated in public.

We are mindful of the difficulty in attempting to impose tort liability on judges and prosecution officers who enjoy immunity, as well as the difficulty in defining the scope of liability for state officials who are responsible for complying with the victim's rights statute. Notwithstanding the departure from blind adherence to the concept of sovereign immunity, which has been accomplished through both legislation and judicial decisions, the concept of judicial and prosecutorial immunity remains alive and well:

> "[T]here has been a decided reluctance in all jurisdictions that have considered the question to impose liability upon the state for certain activities conducted by its agents and servants. * * * It would be unthinkable, for example, to hold the state liable for a wrong decision of its courts or the implementation of a particular state program." *Calhoun v. City of Providence,* 120 R.I. 619, 628, 390 A.2d 350, 354–55 (1978).

Thus, even though we acknowledge the prerogative of the Legislature to fashion a remedy for victims who are ignored by the courts or who are treated unfairly by the state's prosecution officers, we also recognize the complexity inherent in addressing these questions considering the "nearly four hundred years of unbroken adherence to the doctrine of judicial immunity." Joseph R. Weisberger, *The Twilight of Judicial Independence—Pulliam v. Allen,* 19 Suffolk U.L.Rev. 537, 547 (1985).

Our holding today, however, should in no way be construed by those charged with informing crime victims of their rights that this Court considers these rights to be inconsequential or that this Court minimizes the importance of the officials' obligation to comply with the statute conscientiously. *Cf. Yang v. State,* 703 A.2d 754 (R.I.1997) (parole board acted properly in rescinding its vote after hearing from crime victims). Indeed, the Constitution expresses the will of the people, and failure to abide by its words will surely have ramifications beyond the judicial arena. In addition the day may well come when the Legislature provides some sort of remedy, monetary or otherwise, for this precise scenario. *See* Ariz.Rev.Stat. Ann. § 13–

4437 (Supp. West 1997) (implementing victims' rights constitutional mandate by enacting legislation that crime victims have a cause of action for damages).

Under our form of government, however, the function of adjusting remedies to rights is a legislative responsibility rather than a judicial task, and up until the present time the Legislature has not provided a remedy for those instances in which officials fail to inform crime victims of their rights. *See Henry*, 30 R.I. at 37, 73 A. at 107. The immortal words of Chief Justice Marshall ring true, particularly in this case: it is "emphatically the province and duty of the judicial department to [s]ay what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60, 73 (1803). "But inaction upon the part of the legislature, however long continued, can not confer legislative functions upon the judiciary." *Henry*, 30 R.I. at 38, 73 A. at 107. Therefore, notwithstanding our appreciation of the efforts of the General Assembly and the delegates to the 1986 Constitutional Convention and our sympathy for the Bandonis, we are of the opinion that if a cause of action for damages that are due to an official's failure to apprise crime victims of their rights is created, it must originate from the floor of the General Assembly and not from the bench of the Supreme Court.

## IV

### Waiver and Other Issues Raised by the Dissent

The dissent fervently declares this to be "a dark day for state constitutional law and judicial independence in Rhode Island." We do not view this opinion as a pox upon the Constitution, however, but simply another step in our continuing duty to objectively construe the grand charter consistently with well-established principles of constitutional construction. Accordingly, and regrettably, we find it necessary to respond to some of the dissent's comments in order to set the record straight.

### A. The Waiver

■ Contrary to the dissent's assertions that the Bandonis may be entitled to some type of unspecified relief in addition to monetary damages, we conclude that this case has *always* been an action for monetary damages and has *never* been anything else. This matter commenced with the filing of a claim by the Bandonis with the Coventry Town Council, seeking "satisfaction each in the amount of ONE HUNDRED THOUSAND ($100,-000.00) DOLLARS." The Bandonis requested no other forms of relief. After this claim was rejected, the Bandonis filed a two count complaint (later amended to three counts) in the Superior Court, in which they prayed for monetary damages and "all such other relief deemed meet and just by this Honorable Court ." The dissent seizes upon this boilerplate language for the proposition that we must view the complaint with an eye toward whether the Bandonis are entitled not only to monetary damages but to some other unspecified type of declaratory or equitable relief as well. This theory has no basis in law.

■ Appellate courts are especially hesitant to read a particular claim into a complaint's general boilerplate prayer for relief. *See Thomas R.W. v. Massachusetts Department of Education*, 130 F.3d 477, 480 (1st Cir.1997) (quoting *Fox v. Board of Trustees of State University of N.Y.*, 42 F.3d 135, 141–42 (2d Cir.1994)). When faced with questions regarding similar terminology, other courts have held that a general prayer for "such further relief as this court deems just and proper" cannot possibly operate to preserve a claim for damages "where there is no specific request and no evidence to sustain a claim for reimbursement." 130 F.3d at 480. *See also Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (reversing the Ninth Circuit Court of Appeals for, among other reasons, awarding nominal damages when the complaint requested "all other relief that the Court deems just and proper under the circumstances" while stating that the general boilerplate prayer for relief did not save this case from mootness); *Employers Insurance of Wausau v. Bodi–Wachs Aviation Insurance Agency, Inc.*, 846 F.Supp. 677, 686 (N.D.Ill.1994) (no claim for monetary damages when complaint alleged "such other and

further relief as the Court deems fit and proper").

Likewise we are of the opinion that with the exception of the specific prayer for monetary damages, the Bandonis' general boilerplate language is superfluous and simply insufficient to support any claim upon which other relief may be granted. Even with the most generous reading we are simply unable to infer a claim for declaratory or injunctive relief within the four corners of the Bandonis' complaint. Consequently it is inappropriate for us to consider awarding the Bandonis "more relief than [they] sought." *Direct Action for Rights and Equality v. Gannon,* 713 A.2d 218, 226 (R.I.1998).

Our conclusion is buttressed by one additional fact that cannot be overlooked—the Bandonis simply do not want other nonmonetary remedies and have resoundingly foreclosed our consideration of other potential remedies on several occasions. In their memorandum opposing defendants' joint motion to dismiss, the Bandonis prayed for a monetary award while maintaining that "any opportunity to vacate or correct Richardson's sentence [is now permanently lost] by the attachment of 'jeopardy.' " [15] Following the dismissal of their complaint, the Bandonis filed an appeal to this Court. In their Rule 16 statement (now Rule 12A of the Supreme Court Rules of Appellate Procedure) the Bandonis phrased the issue in this case as a question of whether "there [is] presently recognized a civil action for *damages* " when defendants fail to perform their duties as set forth in article 1, section 23, or the Victim's Bill of Rights. (Emphasis added.) After this case was assigned to the full-argument calendar, the Bandonis submitted a fifty-one-page brief-in-chief, in which they made their request for relief crystal clear by stating that:

> "it is certainly within the authority of this Honorable Court to void an illegal act by another branch of government or refuse to give it effect, but it cannot seriously be suggested by these civil defendants that

the criminal's plea and sentence can or should now be voided or given no effect in order to place the plaintiffs back before the District Court to exercise their constitutional rights as the victim of his crime. Nor is it remotely conceivable that the executive branch could, as a practical matter be 'enjoined' from proceeding with the prosecution of criminal cases without proper notification to the victim involved; that would only serve to wreak havoc with an already overburdened judicial system, and could interfere seriously with those constitutional rights guaranteed to criminal defendants. To allow the plaintiffs in this action a 'remedy' whereby they might only *now* address the court as to the impact of the crime *after* the defendant has been sentenced would defeat the entire purpose of Article 1, sec. 23, which purpose is to guarantee the victim of crime a meaningful voice in the criminal process, 'before sentencing,' and an opportunity directly to affect the sentence with his statements as to the impact of the perpetrator's crime upon him. * * * Money damages are the *only* adequate and effective remedy in this instance."

Despite the fact that the Bandonis *never* requested, raised, suggested, or even mentioned a possible solution short of monetary damages throughout any of the twists and turns of this entire case, and despite the fact that defendants have not written a single word about any other possible relief, at oral argument the author of the dissent *sua sponte* seized upon this "other relief" theory and surprisingly suggested that a possible remedy available to the Bandonis would be vacating Richardson's plea, notwithstanding the fact that Richardson was not a party to this litigation. Now the dissent embarks upon a mission to "discern whether plaintiffs may be entitled to *any* form of relief that a court might be able to award for the legal violation(s) alleged" while faulting the majority for its "unjustifiable conclusion that the

---

**15.** We note that the dissent, "without deciding," does not foreclose the possibility of vacating a criminal defendant's sentence for the purpose of resentencing after having allowed the victim or victims the opportunity to address the court. We express no opinion upon this proposition and any possible implication of the double jeopardy clause since this is beyond the scope of our opinion.

Bandonis have waived their non-monetary-damages claims," which "has the unfortunate effect here of truncating the Bandonis' complaint by foreclosing the possibility of their obtaining any additional relief * * * beyond monetary damages." However, while vehemently asserting that there may be other avenues of relief available to the Bandonis, the dissent leaves unanswered the question of what other relief may be appropriate. This task is delegated in the first instance to a trial justice of the Superior Court.

We reiterate, however, that the Bandonis are simply not seeking the remedies espoused by the dissent and accordingly two days after oral argument filed a three-page post argument memorandum "in light of certain questions raised *by the Court* at oral argument as to the issue of damages and/or other remedies." (Emphasis added.) In this memorandum the Bandonis maintained the course they held since first filing their claim with the Coventry Town Council—that in this particular instance monetary damages are "the only viable remedy." In an attempt to leapfrog this obvious waiver hurdle, the dissent throws out a carefully selected snippet of the Bandonis' memorandum, which states that " '[i]t is certainly within the authority of the Court to declare a remedy, short of an action for damages.' " Apparently this excerpt is intended to support the dissent's conclusion that the Bandonis themselves have acknowledged the possibility of other forms of relief and that our conclusion to consider only monetary damages summarily punishes the Bandonis for their forceful advocacy of one particular form of relief.

The dissent takes great liberty with this argument.

 Indeed, even a cursory reading of the memorandum finds that the Bandonis did state in their opening sentence that "[i]t is certainly within the authority of this Court to declare a remedy, short of an action for damages." After stating this universal rule, however, the Bandonis proceed to state unequivocally in the next sentence that "[i]n this particular case, however, such a remedy is unavailing, and potentially dangerous."[16] In light of the selectivity of language with which the dissent dismisses what we conclude to be a waiver, we deem it necessary to append the entire unedited post argument memorandum as the Appendix to this opinion. *See* Appendix A.

Therefore, we are quite comfortable with our conclusion that the only issue before this Court is the question of a viable claim for monetary damages. We suggest that the spice for this argument has been supplied as part of the dissent's own ingredients. Thus, while providing the meat for this *sua sponte* soup, the dissent not only endeavors to stir the pot but also to spank the majority with the ladle.

Finally, after creating the illusion that this case is about some unspecified remedies, the dissent fails to do the spade work necessary to plant such a utopian garden. In the penultimate portion of the dissent, where we anxiously searched for the pronouncement of just what these remedies would entail and how they would be enjoyed by the Bandonis, the dissent drops the ball. Rather than venture into the quagmire of constitutional prob-

16. In concluding that the Bandonis are entitled to some other unspecified nonmonetary remedies, the dissent refers to Rule 54(c) of the Superior Court Rules of Civil Procedure. We simply disagree with the dissent's suggestion that this rule has any applicability to cases that are dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. General Laws 1956 § 9-1-30(a) is a legislative determination that for most actions brought in the Superior Court at law for monetary damages, the pleadings shall not "contain an ad damnum or monetary amount claimed * * * [but], the complaint shall state that the monetary amount claimed is sufficient to establish the jurisdiction of the superior court." Rule 54(c) provides that the *judgment* in an action wherein a party is

successful in *establishing a claim* should include the relief to which the party is *entitled*. Rule 54(c), however, cannot save a claim lacking substantive merit. Moreover, the cases upon which the dissent relies are inapposite. *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 66, 99 S.Ct. 383, 387, 58 L.Ed.2d 292, 299 (1978), stands for the proposition that "while a meritorious claim will not be rejected for want of a prayer for appropriate relief, a claim lacking substantive merit obviously should be rejected." *Accord Doe v. United States Department of Justice*, 753 F.2d 1092, 1104 (D.C.Cir.1985). None of these cases has any applicability to a situation in which a trial justice, or an appellate court, *sua sponte*, extends relief that has not been requested or anticipated by anyone.

lems and policy considerations that this any-remedy-possible theory presents, not the least of which concern the double jeopardy clause, the doctrine of res judicata, accord and satisfaction, joinder, the statute of limitations, and judicial immunity, the dissent takes a page from the Constitutional Convention's own playbook, ducks the issue, and calls upon a single justice of the Superior Court to make the play. The dissent concludes that "these are decisions that should be made in the first instance by the Superior Court." Rest assured, however, that if the trial justice fumbles or misses the assignment, the play will be subject to review by the same quarterback. Indeed the dissent raises more questions than it answers. To be sure, the ultimate question before this reviewing body is whether the trial justice erred when he ruled that the complaint failed to state a claim upon which relief may be granted. But when this Court remands a case for further proceedings, as the dissent would do in this instance, we also have the responsibility to provide adequate guidance to the trial court. The fact that there will be a Monday-morning quarterback available to dissect the game play-by-play is of little comfort to the trial court. Accordingly, for all its efforts the dissent leaves the most important and most difficult question unanswered. What are the Bandonis' remedies?

Finally, in spite of our conclusion that this case does not represent an appropriate circumstance for this Court to create a remedy judicially, the dissent implies that it stands alongside comfortable precedent. See *Bivens, supra; Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) (exclusionary rule). Although the dissent is correct in suggesting such cases as these represent examples of judicial activism, the Court in these cases followed its enthusiasm to the end by actually defining the precise parame-

ters for the remedies that it had just created.[17]

## B. So–Called Prior Precedent

Additionally the dissent relies on so-called prior precedent from Rhode Island, as well as our sister states, that has authorized a direct cause of action from their individual constitutions. We have little trouble distinguishing this line of reasoning since these cases are not the least bit instructive on the question presented by *this* case—whether article 1, section 23, of the Rhode Island Constitution provides a direct cause of action. We too can cite a litany of cases from other jurisdictions supporting the proposition that specific provisions of other states' constitutions either do or do not provide for a direct cause of action (*Bivens* action). But none of these cases are persuasive to answer the specific question presented by *this* case, given the fact that Rhode Island's victims' rights amendment simply cannot be compared to New York's equal protection clause, North Carolina's free speech clause, or Maryland's due process or search and seizure clauses, as the dissent attempts to do.

Similarly the dissent's reference to this Court's prior precedent with respect to takings clause cases suffers from the same infirmities. This distinction is highlighted by two glaring differences: (1) the takings clause is a self-executing provision, see, e.g., *Annicelli v. Town of South Kingstown,* 463 A.2d 133 (R.I.1983), and perhaps even more importantly, (2) the text of the takings clause expressly provides for a remedy. See art. 1, sec. 16 ("Private property shall *not* be taken for public uses, *without just compensation*") (emphases added). Therefore, while we sympathize with the dissent's predicament in espousing what are obviously deeply held beliefs, we recognize the dearth of case law on this significant subject and believe that the procrustean effort to analogize the case at

**17.** It is noteworthy that the judicial remedies we refer to all arose from violations of one of the Bill of Rights. In addition, these judicially created remedies have received their fair-share of criticism. *See Meyer,* 510 U.S. at 484, 114 S.Ct. at 1005, 127 L.Ed.2d at 322 ("In our most recent decisions, we have 'responded cautiously to suggestions that *Bivens* remedies be extended into

new contexts'"); *State v. Burbine,* 451 A.2d 22, 26 (R.I.1982) (*Miranda* followed by a "thunderclap of criticism"); Note, *Taking Back Our Streets: Attempts in the 104th Congress to Reform the Exclusionary Rule,* 38 B.C. L.Rev. 205 (1996) (observing Congress' efforts to modify or to repeal the exclusionary rule).

bar to some so-called prior precedent is entirely misplaced.[18] It is perhaps for this reason that after much fanfare discussing "issues" that are either premature or not in controversy,[19] the dissent finally arrives at what it terms (and we agree) the overarching issue in this case—whether article 1, section 23, is self-executing.

On this issue the dissent concludes that article 1, section 23, is self-executing because (1) the victims' rights amendment contains the specific right for crime victims to address the court before sentencing, (2) the amendment does not contain a directive to the Legislature for further enabling, (3) the motivating factor behind the victims' rights amendment was " 'the need for greater protection for victims of crime,' " and (4) a preliminary draft of article 1, section 23, expressly provided crime victims with a remedy. However, the fact that the 1986 victims' rights amendment contains a provision entitling victims the right to address the court before sentencing is of little consequence since crime victims had enjoyed this right since 1983. Furthermore, the fact that article 1, section 23, does not contain an express directive to the Legislature for further enabling is of no aid to the dissent since the Judiciary Committee's report expressly mandated that the General Assembly (and *not* the courts) create "specific provisions or mechanisms to implement an enforcement provision." We also place little value on the undisputed fact that the motivating factor behind the victims' rights amendment was "the need for greater protection for victims of crime."

It cannot be disputed that since article 1, section 23, was ratified, crime victims have been afforded greater protections. To illustrate this point, we refer to § 12–28–10, entitled "Victims' services unit," which was enacted by the General Assembly a mere one day after the framers ratified article 1, section 23, and is designed to assist victims through every stage of their ordeal. In addition the framers' desire to arm crime victims with greater protection can in no way be equated, *ipso facto*, with the dissent's conclusion that the framers intended for crime victims to have recourse in the law, which is but one way that the General Assembly could increase protection to crime victims. Had the framers actually intended for crime victims to have recourse in the law, they could quite easily have provided for this remedy within the text of article 1, section 23. On the contrary, the framers deleted the very provision, which would have given this precise right to crime victims. Faced with this undeniable fact, the dissent formulates its last-ditch argument that Resolution 86–140 was "altered" but only "for the economy of language." We have already addressed this argument, and we shall not give it anymore attention than it deserves.

Relying upon these subjective considerations, the dissent incorrectly determines

---

**18.** We note that our research has revealed one other case, albeit a lower-court case, where a direct cause of action was brought under a state's victim's rights constitutional amendment. In *Leger v. Stockton Unified School District*, 202 Cal.App.3d 1448, 249 Cal.Rptr. 688 (1988), the plaintiff brought suit, alleging that the school district failed to protect him from physical assault at school. Among the plaintiff's legal theories was that the defendant school district violated article 1, section 28(c), of California's crime victim's constitutional amendment, which provides that "[a]ll students and staff of public primary, elementary, junior high and senior high schools have the inalienable right to attend campuses which are safe, secure and peaceful." 249 Cal.Rptr. at 690. Despite presuming all constitutional provisions to be self-executing, the court held that this provision "declares a general right without specifying *any* rules for its enforcement." *Id.* at 691. Consequently this provision was found to be not self-executing.

**19.** For instance the dissent begins its analysis with the question of whether the Bandonis are "victims." For the purposes of review, however, we assume that the allegations contained in the Bandonis' complaint, including the assertion that they are "victims," are true, a posture defendants conceded at oral argument. *See St. James Condominium Association*, 676 A.2d at 1346. In addition the dissent also laments the "decidedly misplaced" reliance on the *Accent Store Design, Inc. v. Marathon House Inc.*, 674 A.2d 1223 (R.I. 1996), line of cases since these cases are not applicable to a constitutional type of analysis. Although we recognize that one of the governmental defendants has relied on this line of cases, we stress that our opinion relies on *Accent Store Design, Inc.* only in the consideration of the Victim's Bill of Rights legislation.

that article 1, section 23, is self-executing and, after declaring that "no special factors counseling hesitation" exist, concludes that the Bandonis may be entitled to some type of unspecified remedy. Here again we part ways since we cannot agree with the bold and unsubstantiated conclusion that there are "no special factors counseling hesitation" when the United States Supreme Court itself has observed that "the concept of 'special factors counsel[ ]ing hesitation' * * * include[s] an appropriate judicial deference to indications that congressional inaction has not been inadvertent." *Schweiker*, 487 U.S. at 423, 108 S.Ct. at 2468, 101 L.Ed.2d at 381. If this case stands for no other proposition, it must stand for the fact that a majority of this Court does not view the Legislature's inaction as inadvertent, and thus this factor alone constitutes a special factor counseling hesitation.

## V

### Conclusion

For the foregoing reasons we hold that article 1, section 23, is not self-executing and that in order for a cause of action for damages to resonate from the deprivation of a crime victim's rights, the Legislature must create specific provisions or mechanisms as mandated by the framers. The plaintiffs' appeal is denied and dismissed, and the judgment appealed from is affirmed. The papers in this case are hereby remanded to the Superior Court.

FLANDERS, Justice, dissenting.

This is a dark day for state constitutional law and judicial independence in Rhode Island. For crime victims in particular, this day will doubtless live in legal infamy.

I take strong exception to the majority's opinion, but not because it protests too much, persuades too little, and perturbs throughout, nor because of its hamfisted swipes at the dissent's so-called "subjective considerations." Rather, what vexes me is the majority's remarkable refusal to enforce the plain language of the victims' rights amendment to our State Constitution.

Although the grounds for my dissent are explained fully below, they are in brief, as follows:

1. First and foremost, by refusing to enforce a specific, fundamental right guaranteed to crime victims in our State Constitution because the Legislature has not given the courts the express authority to do so, the Court's opinion presents very troubling ramifications for the future of state constitutional law and judicial independence in Rhode Island.

2. The framers of the victims' rights amendment to our State Constitution [20] intended for crime victims to have legal recourse for any violation of their rights as crime victims and did not intend for the amendment to be unenforceable until and unless the General Assembly enacted legisla-

---

**20.** As a result of this state's Constitutional Convention in 1986, the preexisting statutory rights afforded crime victims in Rhode Island were further strengthened by adding a new constitutional provision as follows:

"A victim of crime shall, as a matter of right, be treated by agents of the state with dignity, respect and sensitivity during all phases of the criminal justice process. Such person shall be entitled to receive, from the perpetrator of the crime, financial compensation for any injury or loss caused by the perpetrator of the crime, and shall receive such other compensation as the state may provide. *Before sentencing, a victim shall have the right to address the court regarding the impact which the perpetrator's conduct has had upon the victim.*" R.I. Const. art. 1, § 23. (Emphasis added.)

I conclude that the constitutional right of a crime victim to address the court before sentenc-

ing necessarily includes the various rights to notice contained in the Victim's Bill of Rights Act, G.L.1956 chapter 28 of title 12. This is so because the law upon adoption of the victims' rights constitutional amendment in 1986 indisputably gave victims these various notice rights, and because the statutory rights to notice are essential in order to give any meaning or vitality to the constitutional right to be heard by the court before a criminal defendant is sentenced. Without first obtaining notice of the opportunity to address the court, no victim could be assured of his or her constitutional right to do so. In addition the constitutional history of article 1, section 23, clearly reflects the intent of the framers to build upon the already existing statutory scaffolding erected by the General Assembly when it enacted the Victim's Bill of Rights Act. *See* Journal of the 1986 Constitutional Convention, Vol. 1, No. 8 (May 29, 1986) (Journal).

tion providing for an express private right of action.[21]

3. As a general proposition, specific constitutional rights like those at stake in this case should be presumed to be judicially enforceable absent an express textual negation of such a presumption or a demonstrable textual commitment of this remedial function to another coordinate branch of government.

## I

### The Troubling Ramifications of this Decision

By means of the Court's decision in this case the constitutional right of crime victims to address the court before sentencing of the criminal who injured them "regarding the impact which the perpetrator's conduct has had upon the victim," [22] has been judicially emasculated. As a result, a right that our Constitution declares to be "essential and unquestionable," [23] has been rendered nonessential and questionable; a right that our Constitution decrees is to be "established, maintained, and preserved," [24] has been disestablished, dismembered, and disserved; and a right that our Constitution proclaims to be "of paramount obligation in all * * * judicial * * * proceedings," [25] has been judicially subordinated to a vision of legislative hegemony over the protection of constitutional rights. And I especially regret that Rhode Island's Supreme Court, charged by the Constitution to say what that law is, to be the guardian of our constitutional rights, and to uphold these paramount provisions in all judicial proceedings, has relegated itself to the sidelines in this case when it comes to enforcing the State's Constitution. Instead of functioning as a key player in the protection of constitutional rights, the Court has withdrawn from the field to cower in the shadows of its intended constitutional role. Instead of serving as "an impenetrable bulwark against every assumption of power in the Legislative or Executive * * * [and] resist[ing] every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights," [26] the Court has allowed itself to become a penetrable bullseye for those who would shoot down crime victims' constitutional right. Instead of independently enforcing and protecting these constitutional rights against all violations (whether they come from within or without the government), the Court has consigned the Judiciary in this constitutional case to serving as the liveried footservants of the General Assembly, waiting for some sign on high that it is permissible for this Court to enforce the constitutional rights that are so dear to the People of this State but which, says the majority, this Court is powerless to uphold without express legislative authorization to do so. I emphatically disagree with this shrunken and withered vision of judicial power, responsibility, and independence.[27]

---

**21.** The majority's conclusion that the Bandonis have no legal recourse for the violation of their constitutional rights flies in the face of the framers' intentions as shown by the historical records relating to the 1986 Constitutional Convention. Those records indicate that the victims' rights amendment's failure to include an express provision for crime victims to obtain legal relief for any violation of their rights was solely "for the economy of language" after the Convention delegates had overwhelmingly approved a draft amendment that specifically provided for the enforcement of victims' rights by giving them "recourse in the law." *See infra* III.B.4.

**22.** R.I. Const. art. 1, § 23.

**23.** R.I. Const. art. 1 preamble.

**24.** *Id.*

**25.** *Id.*

**26.** 1 Annals of Congress 439 (1789) (speech of James Madison), *reprinted in* 12 W. Hutchinson, W. Rachel and R. Rutland, eds., *The Papers of James Madison* 206–07 (1991); *see also* Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* 335 (1996) (quoting Madison's speech in the House of Representatives, June 8, 1789).

**27.** An alternative way of framing the issue presented by this case is to question whether this and the other provisions of the Rhode Island Constitution are self-executing or whether they require prior legislative action that would implement or create a special remedy for the violation of such provisions before they can be enforced by the Judiciary. The term "self-executing" has been commonly used to describe those situations wherein a constitutional provision is legally binding and enforceable via a lawsuit filed in the courts—irrespective of whether the Legislature takes any independent action to provide for the enforcement of such rights. This is in contrast to

Accordingly, I consider this to be a sad and most troubling occasion for those who value the role of an independent Judiciary in preserving state constitutional rights against governmental encroachment. A constitutional right—the highest and most sacrosanct of all our legal precepts—has been neutered by this Court's abject unwillingness to enforce its provisions. As a result, our State Constitution is now smaller and less meaningful than it was before this decision was announced. Indeed, it would have been far better had the victims' rights amendment never been enacted than it would perish so ignobly as it has today. It is also ironic that crime victims are in worse shape now than they ever were before this amendment was added to our State Constitution. At least then crime victims could hope that a constitutional amendment would one day enshrine their rights in a supreme legal charter that would be immune to the shifting sands of political power, to the fickle currents of changing economic tides, and to the slings and slights of an oftentimes insensitive criminal-justice system. But now, newly drained of meaning, the dry husks of its words are all that remain of this amendment. Enacted to protect and to empower crime victims, the amendment has been left to flap and twist in the political winds, utterly toothless and "full of sound and fury, [s]ignifying nothing."[28] Its lofty provisions now mock all those crime victims whose heavy load was thought to be lightened by its luminous language and laudable purpose. And the specific constitutional right of all crime victims in Rhode Island to address the court before sentence is imposed upon the criminal who injured them has been transmuted into a parchment pasquinade of its intended meaning.

The majority claims that "the function of adjusting remedies to rights is a legislative responsibility rather than a judicial task." But every time a court or a trial justice exercises judicial power by hearing a case or a controversy and deciding what to do about it, he or she is quintessentially functioning as a judge by adjusting remedies to the legal rights he or she perceives to have or have not been violated. Accordingly I am unable to conclude that the Judiciary is powerless to enforce constitutional rights by fashioning traditional legal and equitable remedies for their violation without prior legislative approval. Otherwise I would have to demote the Judiciary and convert it into a dependent, subservient branch of government and to demean the State Constitution by turning it into a tawdry burlesque of its intended role as the ultimate repository of our most cherished legal rights as Rhode Island citizens.

Ever since Chief Justice Marshall set the record straight in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803), it has been the law in this country that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." Thus "[t]he government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Id.* As a result, "where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear, that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy." *Id.* at 166.[29]

a constitutional provision which is so general in its phrasing or content that it is merely precatory, or to one that expressly requires further legislative action before it can be enforced. *See, e.g., Davis v. Burke,* 179 U.S. 399, 403, 21 S.Ct. 210, 212, 45 L.Ed. 249, 251–52 (1900); *Shields v. Gerhart,* 658 A.2d 924, 927 (Vt.1995). As one commentator has suggested, the more accurate approach is to question whether a constitutional clause is "judicially executing." Susan Bandes, *Reinventing Bivens: The Self–Executing Constitution,* 68 S.Cal.L.Rev. 289, 291 n. 4 (1995).

28. William Shakespeare, *Macbeth,* act 5, sc. 5.

29. The time-honored legal principle that for every wrong there must be a remedy is not only part of article 1, section 5, of our State's Constitution but is also actually a component of the Federal Constitution's due-process clause. Thus in *McKesson Corp. v. Division of ABT,* 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990), the United States Supreme Court held that it was a violation of the Federal Constitution's due-process clause for a state to deny a litigant the right to obtain monetary damages to remedy an illegal

In these circumstances it is not enough for the Court to profess sympathy for crime victims in general and the Bandonis in particular if it still turns a stone-deaf ear on their pleas for judicial relief even as it sheds crocodile tears for their plight. As a result the Bandonis have now been thrice victimized: first, by the drunk-driving criminal defendant who ran them over leaving Mr. Bandoni with a crushed leg and a fractured pelvis; second, by defendant officials who allegedly failed to provide the Bandonis with their notice and presentencing-hearing rights before the criminal who injured them was let off with a no-jail plea bargain; and third, by a majority of this Court who now say that the Bandonis have no remedy for the defendant officials' violation of their constitutional rights.

With all due respect to the majority, I believe that the General Assembly's inaction with respect to providing an express remedy for the violation of a constitutional right cannot possibly be the basis for this Court's refusal to enforce such a right. For if constitutional rights do not become enforceable until and unless the General Assembly decides to make them so, then as a practical matter the General Assembly would be able to veto the Rhode Island Constitution simply by doing nothing. And if we were to take our legal bearings according to this desiccated view of the judicial landscape, then no tree would ever drop in the constitutional forest until the General Assembly allowed the courts to perceive such a fall and to do something about it. Under this constricted vision of the judicial function, our State Constitution would be stillborn until and unless the Legislature deigned to breathe life into its legal corpse by untying the Judiciary's hands to enforce its majestic provisions. Pursuant to this dead-on-arrival jurisprudence, we would have constitutional nullification by legislative inaction. The State Constitution would become a dead letter and the Judiciary would be its pall bearers.

And just because (as the majority correctly notes) "the form and extent of [legal remedies] is necessarily subject to the legislative

power," this does not mean that legal remedies cannot be awarded by the courts for the violation of constitutional rights until and unless the General Assembly first decides to enact legislation providing for such relief. The absurd consequence of such a ruling would be to turn Rhode Island into a topsy-turvy jurisdiction where people who trip on municipal sidewalks may sue their government for damages but individuals whose fundamental constitutional rights have been violated by the government are powerless to do so.

Moreover, the absence of an express monetary remedy in our State Constitution for the violation of crime victims' rights is hardly surprising. When drafting constitutional provisions, framers do not generally specify which rights may be enforceable by private rights of action and which remedies the courts should provide for their violation. *See Davis v. Passman,* 442 U.S. 228, 241–42, 99 S.Ct. 2264, 2275, 60 L.Ed.2d 846, 860 (1979). Thus one searches the Federal and State Constitutions in vain to find specific causes of action and remedies provided therein for any violations of the bill-of-rights provisions set forth in these grand legal charters. But if this omission were to carry the day, then all our rights to free speech, free association, free assembly, petitioning the government, due process, equal protection, legal counsel, freedom of religion, just compensation, trial by jury, and any other rights in the constitutional pantheon would be unenforceable absent legislative creation of private rights of action or authorization of other remedies for their violation. Yet until today the absence of express legislative approval for recourse to judicial relief has never stopped this Court (much less the United States Supreme Court) from enforcing fundamental constitutional rights by fashioning appropriate remedies.

Given that courts are also empowered by these same constitutions to exercise their judicial powers, including without limitation, the power to award monetary damages for

action by the state (there, a preferential tax assessment). *See also Reich v. Collins,* 513 U.S. 106, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994) (reaffirming *McKesson*). Accordingly the result in

this case not only kicks the victims' rights amendment in the teeth but also violates the Bandonis' federal due-process rights.

the violation of legal rights, I believe that it would have been superfluous at best for the framers to provide expressly for the specific types of remedies that may be awarded for constitutional violations and at worst violative of the separation-of-powers principle embodied in the Constitution for them to do so. By vesting the entire Judicial power with the courts in our Constitution, the framers have thereby empowered such courts to decide cases and controversies within their jurisdiction and to grant appropriate legal relief in such cases without any need for creating express private rights of action or for other forms of prior legislative approval to do so. Indeed, how is it possible to exercise the Judicial power at all without affording or denying some type of judicial relief? Thus I believe that it is untenable to hold that the framers of our Constitution gave judicial power to the courts with one hand yet impliedly withheld from them with the other the power to grant relief judicially for the violation of legal rights because they never expressly said the courts could do so in the Constitution.[30]

For these reasons, I have great difficulty with the majority's "applaud[ing] the Legislature and the constitutional framers for their efforts to provide crime victims with specific rights" while failing to enforce such rights. Given the result in this case, it seems to me that this applause is the sound of one hand clapping while the other wields a broad sword to make quick work of those efforts and of crime victims' attempts to exercise their specific rights. I also do not believe that there would be some unspecified but nonetheless "enormous danger of judicially creating a cause of action when both the constitutional framers and the members of the General Assembly had the same opportunity to create a remedy and yet declined to do so." The premise for this line of reasoning seems to be that unless the framers or the General Assembly specifically indicate

that they are creating a new cause of action when new rights are included in the Constitution or in legislation, such new rights are deemed to be unenforceable by the courts. But to my way of thinking, this position has it exactly backwards because, "[a]t least in the absence of 'a textually demonstrable commitment of an issue to a coordinate political department,' * * * *we presume that justiciable constitutional rights are to be enforced through the courts.*" *Davis,* 442 U.S. at 242, 99 S.Ct. at 2275, 60 L.Ed.2d at 860. (Emphasis added.)

Because I believe that the Rhode Island Constitution is the supreme law of this state, that an independent Judiciary is responsible for enforcing its provisions, and that nothing the General Assembly fails to do to provide for the enforcement of constitutional rights should be allowed to touch one legal hair on our State Constitution's head, I would reverse the Superior Court's grant of defendants' Super. R. Civ. P. 12(b)(6) motion to dismiss and hold that plaintiffs have stated a cause of action upon which relief may be granted. Otherwise how would constitutional rights effectively restrain state power if the state was effectively immunized from its own constitutional violations? Or if the state violates an individual's constitutional rights but does not have to bear the cost of that transgression, then what significance do these rights have? *See* M. Freedus, *A Cause of Action for Damages Under the State Constitution: Brown v. State of New York,* 60 Albany L.Rev.1915, 1924 (1996). Thus not only do I dissent from the majority's opinion but I also lament the constitutionally feckless rationale it has adopted to justify this terrible result.

"The point is that no government can sustain itself, much less flourish, unless it affirms and reinforces the fundamental values that define it by placing the moral and coercive powers of the State behind those

---

**30.** Here, as in *Kaya v. Partington,* 681 A.2d 256 (R.I.1996), injured plaintiffs are again being denied the right to recover monetary damages for their injuries on the grounds that the Legislature and the constitutional framers intended by their silence to preclude such relief absent specific legislative creation of a private right of action. For substantially the same reasons set forth in

my dissent to that decision, I would not deprive injured victims of their constitutional right to a remedy for every wrong absent some express indication to that effect from either the Legislature or the framers of the Constitution. As I have explained previously, the only indications we have are precisely to the contrary.

values. When the law immunizes official violations of substantive rules because the cost or bother of doing otherwise is too great, thereby leaving victims without any realistic remedy, the integrity of the rules and their underlying public values are called into serious question." *Brown v. State of New York*, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1144 (1996) (recognizing damages claim directly under the New York Constitution despite the lack of any express provision creating such a private right of action).

I also take little comfort in reading that the Court's holding in this case "should in no way be construed by those charged with informing crime victims of their rights that this Court considers these rights to be inconsequential or that this Court minimizes the importance of the officials' obligation to comply with the statute conscientiously." For I cannot help but note that in the law (as in other aspects of life) actions speak louder than words. In the case of crime victims their rights are in fact "inconsequential" because the Court holds today that there are no legal consequences for those who violate crime victims' rights. Rather, as a result of this decision, persons who violate crime victims' rights can continue to do so with impunity. And I cannot conceive of any better way to minimize the importance of complying with crime victims' rights than by immunizing those who violate such rights from all consequences for their illegal actions. Thus I am not assuaged by nostrums like "the failure to abide by [the words of the State Constitution] will surely have ramifications beyond the judicial arena." I believe that this is no better than telling violators of state constitutional rights that they should not think they are getting away with anything because they will surely pay for their misconduct in the next life—even though they have been given a free pass in Rhode Island's judicial arena to defy the laws of this state with impunity while they continue to violate the rights of crime victims.

Indeed, one of the most distressing aspects of the majority's opinion is the dismissive manner in which it discusses the language of our State Constitution, especially when its treatment of the text is coupled with a seeming inability to comprehend that no state constitutional rights can be "enjoyed" unless and until this Court is prepared to enforce such rights. Thus, when I read the majority saying things like "the fact that the 1986 victims' rights amendment contains a provision entitling victims the right to address the court before sentence is of little consequence since crime victims have enjoyed this right since 1983," I am unable to understand how they can truly believe that these rights have in fact been or can ever be "enjoyed" without being judicially enforceable when they are denied or refused to crime victims like the Bandonis. Moreover, as I will demonstrate, they are simply wrong in their conclusion that the victims' rights amendment only served to codify the same right to address the sentencing court that crime victims had always "enjoyed * * * since 1983."

It is also most regrettable that the majority "place[s] little value on the undisputed fact that the motivating factor behind the victims' rights amendment was 'the need for greater protection for victims of crime.' " The reason it does so, we are told, is that "since article 1, section 23, was ratified, crime victims have been allotted greater protections." The majority then points to the Legislature's creation of a victims' services unit per G.L. 1956 § 12–28–10 as exhibit A in support of its conclusion while reminding us that this unit "is designed to assist victims through every stage of their ordeal."

But this is the same victims' services unit that has allegedly failed miserably in providing the Bandonis with their constitutional right to address the court before the criminal that injured them was sentenced to a slap-on-the-wrist fine! What the majority seems unable to grasp is that the legislative and constitutional allotment of greater and greater "protections" for crime victims is totally meaningless unless and until those rights become legally enforceable. Without the ability to compel compliance or compensation when such protections are refused or withdrawn, they are "enjoyed"—if at all—only at

sufferance and not as a matter of right.[31] Unless and until those rights can be enforced when they are violated, there are simply no rights, no protections, and no enjoyments worth mentioning, let alone worth crowing about.

I now turn to review the specific circumstances of this case and to the legal analysis in support of my dissent from this ruling.

## II

### The Proper Standard of Review and the Plaintiffs' So-called Waiver of Their Rights to Remedies Other than Damages

When reviewing the grant of a Rule 12(b)(6) motion to dismiss a complaint for failure to state a claim, this Court tests the sufficiency of the complaint by assuming that all the factual allegations are true and by resolving any legal doubts in favor of the plaintiff. *See Rhode Island Affiliate, ACLU v. Bernasconi*, 557 A.2d 1232, 1232 (R.I. 1989). Most significantly, dismissal of a civil complaint under Rule 12(b)(6) is proper only if it "appears beyond a reasonable doubt that a plaintiff would not be entitled to relief under any conceivable set of facts." 557 A.2d at 1232 (quoting *City of Warwick v. Aptt*, 497 A.2d 721, 723 (R.I.1985)). Moreover, because a court may grant *any such relief to which a complainant is entitled* "even if the party has not demanded such

relief in the party's pleadings," *see* Super. R. Civ. P. 54(c), "a failure to demand the appropriate relief will not result in a dismissal. *The question is not whether plaintiff has asked for the proper remedy but whether he is entitled to any remedy.*" 10 Charles A. Wright, Arthur A. Miller & Mary M. Kane, *Federal Practice & Procedure: Civil 2d* § 2664, at 153–54 (2d ed.1983). (Emphasis added.) *See also* 1 Kent, *R.I. Civ. Prac.* § 12.9, at 114 (1969) ("[t]he complaint should not be dismissed because its allegations do not warrant the type of relief demanded if they do support the granting of some relief").

Thus it is the duty and province of this Court to assume that the facts pled in the plaintiffs' complaint are true and to discern whether plaintiffs may be entitled to *any* form of relief that a court might be able to award for the legal violation(s) alleged. If plaintiffs may be so entitled to some type of relief for the legal violation they have alleged, then dismissal under Rule 12(b)(6) is improper. As framed, the Bandonis' complaint averred that defendants deprived them of specific rights that they were guaranteed as crime victims under the laws and the Constitution of Rhode Island. Proceeding under both negligence and constitutional-deprivation theories to recover for the injuries they allegedly sustained as the proximate result of defendants' failure to provide them with these rights (as mandated under G.L. 1956 chapter 28 of title 12[32] and article 1,

---

**31.** We must never forget that during the darkest days of the Soviet Union when the brutal boot of Stalinism had crushed all human freedom and liberty in that part of the globe under its massive heel, the U.S.S.R. could boast of having a constitution that "allotted greater protections" to its citizens than any other country in the world, including the United States. But because its citizens could not enforce these rights, such so-called protections became a mockery of what it meant to live in a just and free society. So too must we be ever vigilant that our own constitutional and legal "protections" are not allowed to suffer a similar ignominy. *See* Hon. Nick Smith, *Restoration of Congressional Authority Over the Regulatory Process*, 38 Harv. J. on Legis. 323, 328 n. 31 (1996); Molly W. Lien, *Red Star Trek: Seeking a Role For Constitutional Law in Soviet Disunion*, 30 Stan. J. Int'l L. 41, 74–75 (1994).

**32.** In 1983 Rhode Island's General Assembly passed the Victim's Bill of Rights Act, G.L.1956

chapter 28 of title 12 (hereinafter the act). As amended, the act presently affords victims of criminal offenses a panoply of rights, including (1) the right to address the court prior to the imposition of sentence upon a defendant who has been adjudicated guilty of a crime following a trial, § 12–28–4; (2) the right to address the court prior to acceptance of a plea negotiation and imposition of sentence upon a defendant who has pleaded nolo contendere to a crime, § 12–28–4.1; (3) the right to be informed of the disposition of the case against the alleged offender, § 12–28–3(a)(12); and (4) the right to make a written impact statement to be presented to the court for review prior to the acceptance of any plea negotiation, § 12–28–3(a)(14).

Various governmental agencies are charged with the responsibility of providing victims with notification of these rights: "Unless otherwise specified, in felony cases it shall be the responsibility of the attorney general and the victims' services unit * * * to make certain that the vic-

section 23, of the Rhode Island Constitution), they sought not only monetary damages but also *"all such and other relief deemed meet and just."* (Emphasis added.) Accordingly on appeal this Court must review the Bandonis' complaint with an eye to whether they might be entitled to monetary damages *or* to some other form of relief, given the facts as pled in their complaint and resolving all doubts in their favor.

The majority's misapplication of these long-established standards—together with its unjustifiable conclusion that the Bandonis have waived their non-monetary-damages claims (discussed below)—has the unfortunate effect here of truncating the Bandonis' complaint by foreclosing the possibility of their obtaining any additional relief to which they may be rightfully entitled beyond monetary damages. In purporting to limit its decision to plaintiffs' monetary-damages claim, the majority seizes upon an argument advanced by plaintiffs in a supplemental memorandum (filed with this Court after oral argument) that a monetary award is "the only viable remedy in this particular instance" and claims that it constitutes a waiver by the Bandonis of all other forms of relief to which they may be entitled. However, I do not believe that the Bandonis' argument should be construed by this Court to constitute a waiver of their right to obtain whatever relief they are legally entitled to obtain after a trial if they are able to prove the alleged violations of their constitutional and statutory rights as crime victims.

First, the Bandonis have not agreed to any such waiver merely by arguing that one particular remedy—monetary damages—is the only one that they believe is viable. Although their belief may well prove to be correct, that is a matter to be decided in the first instance by the Superior Court after hearing all the evidence and determining what types of relief, if any, might be appropriate in the circumstances. *See* 10 *Moore's Federal Practice* § 54.72[1][a], at 54–132 (3d ed.1997). Indeed the Bandonis themselves recognized the possibility that other forms of relief might be awarded to them when they stated in this same postargument memorandum that "[i]t is certainly within the authority of the Court to declare a remedy, short of an action for damages." [33]

The majority contends that "the Bandonis *never* requested, raised, suggested, or even mentioned a possible solution short of monetary damages throughout any of the twists and turns of this entire case." [34] But this assertion is refuted by a mere reading of the postargument memorandum the Court has appended to its opinion. There, the Bandonis raise, suggest, and mention various possible solutions short of monetary damages. First, they discuss the possibility of resentencing the criminal defendant. Although

tim receives such notification as is required by [this act]. In misdemeanor cases, it shall be the responsibility of the law enforcement agency making the arrest and of the victims' services unit * * * to make certain that the victim receives such notification." Section 12–28–3(c). The Bandonis contend that they did not receive the notice required by law to enable them to exercise any of the aforementioned rights. In order to enjoy the rights enumerated under the act, crime victims must "make[ ] a timely report of the crime and [ ] cooperate[ ] with law enforcement authorities in the investigation and prosecution thereof." Section 12–28–3(a). Although Mr. Bandoni may have been prevented from reporting the crime because he was hospitalized for several weeks immediately following the accident, Ms. Bandoni (on behalf of herself and her disabled husband) fully cooperated with law enforcement authorities by contacting the police in the days immediately after the incident, by giving them a sworn statement, and by "requesting and receiving assurance at that time" that she and her husband would be contacted

concerning the criminal investigation. Thus there can be no credible argument that the Bandonis did not allege sufficient facts to qualify to receive their statutory rights as crime victims.

33. It is curious that in its discussion of whether article 1, section 23, of the Rhode Island Constitution is self-executing, the majority also apparently recognizes the judicial power to award remedies other than monetary damages by affirmatively citing a constitutional-law treatise for the proposition that a "court may provide injunctive or declaratory relief, as opposed to the specific remedy of damages," where there has been a constitutional injury.

34. Lest the reader forget; the Bandonis' complaint was dismissed on a Super. R. Civ. P. 12(b)(6) motion. Thus "the twists and turns of this entire case" amount to just one big one: the constitutional curve ball thrown at the Bandonis by interpreting the victims' rights amendment to be unenforceable absent the legislative creation of an express private right of action.

they assert that resentencing "[i]n this particular case * * * is unavailing, and potentially dangerous," it is only because they believe that such a remedy does not go far enough in that "Mr. & Mrs. Bandoni cannot be fully restored to their position at the time of the original sentencing." Although this may yet prove to be so, I would not foreclose the possibility of the trial court's awarding such relief merely because it may only turn out to be a partial solution at best to the harm done to these plaintiffs, if their allegations are true. Second, the Bandonis refer to restitution from defendants as a possible remedy in lieu of restitution from the criminal who injured them.[35] Finally, in lieu of a traditional monetary-damages award, the Bandonis suggest that they should at least be entitled to nominal damages.[36] Accordingly for the majority to claim, as it does, that the Bandonis have "waived our consideration of other remedies" and that "this case has *always* been an action for monetary damages and has *never* been anything else" is belied by the very document they have relied upon to reach their waiver conclusion.

Thus it is not the dissent that "refuses to take the plaintiffs at their word" that monetary damages constitute "the only viable remedy in this particular instance." Indeed, far from refusing to take the Bandonis at their word, I agree with them that "[t]he recognition of [a] traditional tort/damages remedy for this violation of the crime victim's rights would serve to maintain the integrity of our state constitution and to avoid conflict with other state and federally guaranteed rights until such time as the legislature chooses to act." Because the majority refuses to recognize any such remedy for the violation of crime victims' rights, it is they and not the dissent who refuse to take the Bandonis at their word.

Furthermore, waiver is the intentional relinquishment or abandonment of a known right. *See State v. Griffin,* 567 A.2d 796, 799 (R.I.1989) (quoting *State v. Brown,* 121 R.I. 422, 426, 399 A.2d 1222, 1225 (1979)). The Bandonis have not agreed to any such waiver, nor should their forceful advocacy of a monetary remedy be summarily punished by this Court in such a peremptory and unjustified fashion. In addition the question before us is not whether the Bandonis are entitled to monetary damages—a specific type of judicial relief—but whether they have stated a claim upon which *any* form of relief may be granted, including without limitation, declaratory relief, an injunction, or monetary damages. Thus, the majority recasts this issue on appeal by involuntarily foisting upon the Bandonis a premature waiver of all other forms of relief to which they may be entitled on the basis of their mere presentation of a legal argument to this Court. The Bandonis' only-viable-remedy argument should not be used to duck the question presented by the Superior Court's dismissal of the Bandonis' complaint on Rule 12(b)(6) grounds, namely, whether the Bandonis may be entitled to any form of relief because of defendants' alleged violation of their constitutional rights.

Finally, the Bandonis' complaint did not merely ask for monetary relief. Rather per Rule 54, it asked for all such relief to which they may be legally entitled after a trial on the merits. The majority mischaracterizes their request for relief—a prayer for monetary damages and "all such other relief deemed meet and just by this Honorable Court"—as a request for monetary damages only. According to the majority, the inclusion of the latter "boilerplate language" was meaningless and the Superior Court was limited to awarding only monetary damages to the Bandonis, if they were entitled to such relief. Unfortunately for the Bandonis, the majority's viewpoint completely ignores the weight of legal authority on this subject.

The general rule is that "[c]ourts are traditionally encouraged to adjudicate the basic legal claim, even where the plaintiff has

---

**35.** "At trial, as a matter of law, the judge may well decide that, as a reasonable district court judge with these victims before him, he would have ordered restitution as part of the original sentence."

**36.** "[W]hereas the Court may decline to create a 'Bivens' damages remedy to vindicate, otherwise, the loss of these crime victims' rights, *it would seem that they are entitled, in the very least, to those nominal damages allowable at common law for their loss, as inadequate as that remedy may be.*" (Emphasis added.)

failed to seek the precisely correct relief but has instead relied on a general request for 'other appropriate relief.'" *Doe v. United States Department of Justice*, 753 F.2d 1092, 1104 (D.C.Cir.1985); *see also United States v. Marin*, 651 F.2d 24, 30–31 (1st Cir.1981) (award of damages proper when complaint did not contain explicit prayer for damages but did contain a prayer for "such other and further relief as is equitable"). The case law relied upon by the majority to ignore the Bandonis' general prayer for relief is either inapplicable,[37] contrary to the weight of authority,[38] or helpful to the Bandonis.[39]

However, even assuming arguendo that the Bandonis' "boilerplate provision" was "superfluous," their request for damages would not preclude awarding them other types of relief. The failure of a pleading to demand a particular kind of relief does not preclude a court from awarding that type of remedy "because Rule 54(c) commands the granting of *any appropriate* relief." 10 *Moore's Federal Practice*, § 54.70[1] at 54–

125. (Emphasis added.) *See also Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 66, 99 S.Ct. 383, 387, 58 L.Ed.2d 292, 299 (1978) (although claims lacking substantive merit should be dismissed, omissions in a prayer for relief do not bar redress of meritorious claims).

> "Essentially, Rule 54(c) ensures that substance will prevail over form. If the course of the action as litigated by the parties shows that relief of a particular kind or scope is warranted, that relief should be awarded, regardless of the state of the pleadings. *The available relief is determined by the proof, not the pleadings, and it is the duty of the court to grant all relief to which a party is entitled on that proof.*" 10 *Moore's Federal Practice*, § 54.72[1][a] at 54–130. (Emphasis added.)

And contrary to the majority's contention, this rule does *not* apply only when a final judgment is about to be entered.[40] Thus,

---

**37.** The majority's reliance on *Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Thomas R.W. v. Massachusetts Department of Education*, 130 F.3d 477 (1st Cir.1997); and *Fox v. Board of Trustees of the State University of New York*, 42 F.3d 135 (2d Cir.1994), is misplaced. Unlike those cases, the factual situation at bar does not involve a plaintiff's attempt on appeal "'to breathe life into a moribund dispute,'" *Fox*, 42 F.3d at 142, by newly proffering a claim for one form of relief when the original claim for relief has since become moot on appeal and no longer forms the basis of a live controversy. *Cf. Arizonans*, 520 U.S. at 60–61, 117 S.Ct. at 1070–71, 137 L.Ed.2d at 195–96 (criticizing the plaintiff's attempt to "extract[] [a prayer for nominal money damages] late in the day from [a] general prayer for relief * * * solely to avoid otherwise certain mootness"); *Thomas R.W.*, 130 F.3d at 480 (despite general prayer for relief, the plaintiff's claim for reimbursement which was raised for the first time in appellate reply brief does not save case from its otherwise moot status).

**38.** As discussed further below, the majority's reliance on dicta from *Direct Action for Rights and Equality v. Gannon*, 713 A.2d 218, 226 (R.I. 1998), for the proposition that "it is inappropriate * * * to consider awarding the Bandonis 'more relief than [they were] seeking'" is at odds with the directive of Rule 54(c) of the Superior *Court* Rules of Civil Procedure, which permits a court to grant any appropriate relief to a plaintiff notwithstanding his or her failure to demand that

specific kind of remedy. *See Gannon*, at 266 (Flanders, J., concurring).

**39.** Although the court in *Employers Insurance of Wausau v. Bodi–Wachs Aviation Insurance Agency, Inc.*, 846 F.Supp. 677, 686 (N.D.Ill.1994) (*Employers Insurance*), opines that a boilerplate prayer for relief (such as that contained in the Bandonis' complaint) "does not operate as an independent request for relief of any sort," it also concludes that such a prayer would at least allow "amendment of a complaint to conform to the proofs adduced at trial." Thus even the *Employers Insurance* court would agree that the Bandonis' general prayer for relief would allow them to proceed to trial, where they could modify the relief they requested in light of facts adduced at trial so that the trial judge could then fashion an appropriate remedy. *See id.* (noting that a general-prayer provision "permits some further type of relief (one that is presently unspecified) to be fashioned by the court during or at the end of a legal proceeding").

**40.** To be sure, Rule 54(c) "has no application when judgment is actually entered *against* the party" who sought relief. 10 *Moore's Federal Practice* § 54.72[2], at 54–138 (3d ed.1997). (Emphasis added.) But the reason this is so is that Rule 54(c) "permits the awarding of all available relief on a claim when liability on the claim has been established" by the proof offered. *Id.*, § 54.72[2] at 54–137. Thus, if the Bandonis ultimately prove all elements of their claims, "any available remedy may be ordered, notwithstanding [their] error in designating the claim in

when as here the Bandonis are under a duty to make (1) "a short and plain statement of the claim showing that the pleader is entitled to relief" and (2) "a demand for judgment for the relief the pleader seeks," Super. R. Civ. P. 8(a), the question on defendants' motion to dismiss for failure to state a claim is whether the Bandonis' claim as stated would give them a right to *any form of relief that a court can award and not just the particular type of relief they requested.* *See* 10 Wright, Miller & Kane, *Federal Practice,* § 2664 at 152–54; 1 Kent, *R.I. Civ. Prac.,* § 12.9 at 114. In any event the liberal standard for reviewing complaints under Rule 12(b)(6), at a minimum, required that the Bandonis be permitted to amend their complaint in order to seek the appropriate relief or, alternatively, to read such relief into their omnibus prayer for "other appropriate relief" that was laid out in their original complaint. *See Doe,* 753 F.2d at 1104.

The majority criticizes the dissent for having "drop[ped] the ball"[41] because it allegedly "leaves unanswered the question of what other relief may be appropriate" here and by "delegat[ing this task] in the first instance to a trial justice of the Superior Court." Again, this criticism rings hollow in light of the law. Because "[t]he available relief is determined by the proof adduced at trial, not by the pleadings," 10 *Moore's Federal Practice,* § 54.72[1][b] at 54–132, it is premature to determine precisely what relief (if any) should be awarded to the Bandonis. Moreover, their purported demand for only a cer-

tain kind of relief would not be binding upon a court because "any remedy supported by the record may be awarded under Rule 54(c)" as long as it is justified by the proof. *See id.,* § 54.72[1][c] at 54–133.

For these reasons I believe that the Court has no basis to conclude that the Bandonis have waived their right to obtain whatever legal and equitable relief they may be entitled to receive. Moreover, although the majority's opinion purports to limit its analysis to whether crime victims may be entitled to monetary relief, its reasoning on this question supports the conclusion that crime victims are not entitled to *any* remedy for alleged violations of their constitutional rights because neither the General Assembly nor the drafters of the victims' rights constitutional amendment have expressly provided them with a cause of action for such a violation. Rather the majority apparently believes that the power to award monetary damages, or for that matter any other form of relief for alleged constitutional violations, rests exclusively in the domain of the General Assembly and that the Judiciary is not entitled to fashion appropriate legal and equitable remedies for alleged constitutional violations such as those at issue here. As previously stated, I strongly disagree with this conclusion.

I also believe that the liberal amendment and joinder-of-claim provisions of Rules 15 and 18 of the Superior Court Rules of Civil Procedure—in combination with the aforementioned remedies mandate of Rule 54(c)—

the pleadings." *Id.,* § 54.72[2] at 54–138. Although these "available remedies" (if any) will actually be awarded to the Bandonis only when (if at all) judgment is rendered in their favor, this does not mean that dismissal of their complaint is proper because there is no final judgment upon which to grant relief. Rather, when the averred facts in a complaint indicate that a plaintiff may be entitled to some sort of relief notwithstanding the failure to demand such a remedy expressly, dismissal for failure to state a claim is improper. *See, e.g., Doe v. United States Department of Justice,* 753 F.2d 1092, 1104 (D.C.Cir. 1985) (a litigant's failure to request a particular form of relief does not permit a trial court to grant a Rule 12(b)(6) motion to dismiss for failure to state a claim "when the availability of some relief is readily apparent on the face of the complaint"); *Norwalk Core v. Norwalk Redevelopment Agency,* 395 F.2d 920, 925–26 (2d Cir.1968)

("[w]hen a motion to dismiss a complaint is made * * * a complaint should not be dismissed for legal insufficiency except where there is a failure to state a claim on which *some* relief, not limited by the request in the complaint, can be granted") (emphasis in original); *Burton v. State Farm Mutual Automobile Insurance Co.,* 335 F.2d 317, 320 (5th Cir.1964) ("The District Judge apparently thought that the pleadings limited the scope of available relief, and if that formally sought was not allowable none could be granted. *This is not the law* ") (emphasis added).

41. Those players who take themselves out of the game and who choose to sit on the sidelines never have to worry about dropping the ball. Their happy lot is errorless and fumble-free. Of course, their scoring opportunities are also decidedly limited, as is their ability to contribute to their team's overall success.

provide yet another basis for reversing the lower court's dismissal of the Bandonis' complaint. Even if the Bandonis' complaint for monetary damages and other relief directly under the Rhode Island Constitution and the General Laws could not be entertained in its present form (as posited by the majority), application of Rule 15 amendment and Rule 18 joinder principles would have permitted the Bandonis to join their present claims with a declaratory-judgment claim under the Uniform Declaratory Judgments Act, G.L. 1956 chapter 30 of title 9.[42] According to the allegations in the Bandonis' complaint, plaintiffs received no notice of the criminal defendant's arraignment, of the pretrial conference where the plea bargain was arranged, or of their right to make a victim's impact statement to the court prior to the criminal defendant's sentencing. If these facts are proven, the Bandonis were thereby deprived of their specific statutory and constitutional rights as crime victims. Thus even if the Bandonis are not entitled to a direct cause of action under the Rhode Island Constitution, their averred facts at a minimum provide the basis for a declaratory judgment concerning whether defendants violated their rights thereunder. *See* chapter 30 of title 9. And to the extent that the Bandonis are in fact entitled to a declaration that their rights have been violated, they may be further entitled to such supplemental relief as may be necessary to effectuate an entered declaratory order. *See* § 9–30–8; *Sousa v. Langlois,* 97 R.I. 196, 199, 196 A.2d 838, 840 (1964). Accordingly, because the Bandonis may be entitled to other forms of relief besides monetary damages and because the Legislature has expressly authorized declaratory-judgment actions as a means to obtain such relief, I believe that dismissal here was inappropriate for this reason alone, even if the Bandonis could not possibly obtain a monetary-damages remedy. However, for the reasons previously indicated and those stated

below, I believe the Bandonis have stated a claim for which monetary damages may be recovered as well as one for which equitable and declaratory relief may be awarded.

## III

### Analysis

#### A. *Plaintiffs' Status as Victims*

As a threshold matter I would put to rest defendants' contention that the Bandonis do not possess any cause of action as "victims" because the crimes at issue—initially, driving under the influence, and ultimately, reckless driving—are victimless, thus relieving them of any duty to afford plaintiffs with the notice and other victims' rights as set forth in the General Laws and our Constitution. I have little trouble in rejecting this argument and I would hold that the Bandonis have alleged sufficient facts to qualify themselves as victims for purposes of Rhode Island's victim-notification requirements.

First, I do not believe that the prosecution's initial decision to charge the criminal defendant with driving under the influence of alcohol (in violation of G.L.1956 § 31–27–2) instead of driving under the influence of liquor *resulting in serious bodily injury* (in violation of § 31–27–2.6) serves to abrogate any duty imposed on defendants by this state's crime-victims laws. To say that a prosecutorial decision not to charge the criminal defendant with the § 31–27–2.6 offense had the effect of stripping the Bandonis of their victim status would be to ignore the Legislature's definition of a crime "victim" as "one who has sustained personal injury or loss of property directly attributable to the criminal conduct of which the defendant has been charged." Sections 12–28–4.1, 12–28–4.3.

Second, I conclude that the mere fact that a criminal defendant has been able to plea bargain his way to a reduced, victimless

---

42. *Cf. Doire v. Commerce Insurance Co.,* 692 A.2d 696, 697 (R.I.1997) (although the plaintiffs' declaratory-judgment action should have been brought as a direct suit under a statutory provision, the trial court should not have dismissed the action but instead allowed the plaintiffs to join their monetary-damages claim and proceed to a trial under the statute providing for such a

claim); *Chase v. Mousseau,* 448 A.2d 1221, 1224 (R.I.1982) (even though the plaintiff's claims for monetary damages were inappropriate under a declaratory-judgment cause of action, dismissal was improper because joinder of claims was permissible under the liberal joinder provisions of Super. R. Civ. P. 18).

charge can hardly be dispositive of an injured person's victim status. To say that one's victim status depends on the nature of a charge would allow artful or expedient charging by the prosecution to undercut the primary purpose of the state's constitutionally guaranteed victim-notification and hearing requirements. Moreover, were the prosecution's plea bargaining to have the effect of foreclosing any right of the Bandonis to victim notification and to a presentencing hearing, then the victim-notification and hearing requirements of our laws would be rendered nugatory because they would vanish whenever prosecutorial discretion or the negotiating savvy of a defendant's attorney resulted in a reduction in the criminal charge. Such a result would contradict the evident purpose of victims' rights laws to afford such individuals greater remedial protection at the very time when they need it most: when the criminal is being sentenced for his or her crimes and attempting to get off as lightly as possible via a plea bargain or a reduced sentence.

### B. Viability of Plaintiffs' Constitutional Theory of Recovery

Having determined that the Bandonis are victims, I now reach the overarching issue presented by this case—whether in the absence of an explicit legislative or constitutional directive creating a private right of action, a crime victim *may* be entitled to some form of judicial relief for the deprivation of his or her rights as set forth in the Rhode Island Constitution.[43]

### 1. Rhode Island Precedent

Until today this Court has never required legislative creation of a private cause of action as a precondition for a damages recovery based upon the unlawful deprivation of a state constitutional right. On the contrary we have previously recognized that a cause of action would lie directly under the Rhode Island Constitution and we have permitted a monetary recovery thereunder, despite the absence of any legislative authorization for the courts to recognize such a cause of action or to provide such monetary relief. *See, e.g., Annicelli v. Town of South Kingstown,* 463 A.2d 133 (R.I.1983); *E & J, Inc. v. Redevelopment Agency of Woonsocket,* 122 R.I. 288, 405 A.2d 1187 (1979).[44] Moreover, we have not previously waited for the General Assembly or for the State Constitution itself to specify a remedial mechanism before judicially enforcing state constitutional provisions by providing other forms of relief. *See, e.g., Avanzo v. Rhode Island Department of Human Services,* 625 A.2d 208 (R.I.1993) (affirming Superior Court judgment of declaratory and injunctive relief for deprivation of the plaintiffs' public-assistance benefits without due process of law as required by article 1, section 2 of the Rhode Island Constitution); *Pimental v. Department of Transportation,* 561 A.2d 1348 (R.I.1989) (declaring that drunk-driving roadblocks violate article 1, section 6's prohibition against unreasonable searches and seizures).

This Court's decision in *Oster v. Tellier,* 544 A.2d 128 (R.I.1988), serves as a further example that this Court need not await action by the General Assembly before enforcing state constitutional rights. There this

**43.** In doing so, I consider the various decisions and rationales of this Court, other state supreme courts, and the United States Supreme Court bearing on the question of whether a cause of action can be implied directly from a specific constitutional provision—the *precise* situation here. The majority, on the other hand, would like to decide this case in a vacuum, simply ignoring the previous case law of this Court and other state supreme courts, which it finds to be "not the least bit instructive * * * [or] persuasive." And if indeed my efforts to review Rhode Island's prior precedent are "entirely misplaced" and "procrustean," it would seem a fortiori that the majority's reliance on other jurisdictions to determine Rhode Island's constitutional test for recognizing a direct right of action is equally

misplaced and entirely contradictory to its professed stance that these cases are neither instructive nor persuasive.

**44.** The Federal District Court in Rhode Island has also expressly found that there is an implied right to sue for damages arising from a violation of the due-process and equal-protection clauses of the Rhode Island Constitution. *Jones v. State of Rhode Island,* 724 F.Supp. 25, 35 (D.R.I.1989) (holding that the framers of the 1986 version of article 1, section 2, implicitly intended to confer a private right of action upon individuals to sue state actors for violations of enumerated due-process and equal-protection rights).

Court affirmed a Superior Court judgment denying the plaintiffs' request for a specific monetary remedy for the defendants' violation of Rhode Island's equal-protection clause, *id.* at 129, but did so not because the court lacked the power or the authority to remedy a constitutional violation without legislative authorization but rather because the plaintiffs failed to proffer evidence to prove the monetary amount by which they were allegedly overassessed. *Id.* at 132.

Although the instances in which this Court has recognized the possibility of a monetary recovery for a state constitutional violation have thus far been limited to "takings" actions brought directly under our State Constitution's just-compensation clause, until today the Court has never stated that it was powerless to do so in the absence of a prior legislative enactment authorizing a private cause of action. In both *Annicelli* and *E & J, Inc.* we addressed whether the plaintiffs had stated causes of action for injuries resulting from regulatory takings prohibited by article 1, section 16. And in both cases we recognized that a private cause of action lies directly under that constitutional provision.[45] And we did so despite the complete absence of any express legislative or constitutional authorization for allowing such a claim.[46]

It is significant that the Bandonis come before this Court seeking relief for the deprivation of fundamental rights. The rights of crime victims are expressly set forth in our Constitution's Declaration of Rights, the repository of Rhode Islanders' fundamental rights. *Compare In re Constitutional Convention,* 55 R.I. 56, 62, 178 A. 433, 437 (1935) (referring to the enumerated rights listed in article 1 of the Rhode Island Constitution as "in substance and effect * * * fundamental rights") *and* R.I. Const. art. 1, preamble

(declaring that the rights enumerated in article 1's declaration of rights are "essential and unquestionable" and that they "shall be established, maintained, and preserved, and shall be of paramount obligation in all legislative, judicial and executive proceedings") *with Pontbriand v. Sundlun,* 699 A.2d 856, 870 (R.I.1997) (holding that plaintiffs seeking monetary and other relief under a constitutionally based cause of action for invasion of privacy did not state a constitutional claim because no fundamental right was involved there).

Other examples abound of this Court's enforcing state constitutional rights invoked by criminal defendants despite the complete absence of any specific textual authorization in the Constitution for the Court to do so. *See, e.g., Pimental v. Department of Transportation,* 561 A.2d 1348 (R.I.1989) (declaring police drunk-driving roadblock to be violative of article 1, section 6, of the Rhode Island Constitution, notwithstanding any indication that this provision in our Constitution was self-executing). In *Pimental* we did not proclaim that the defendant was required to await legislative action before raising a state constitutional defense, nor did we refuse to craft a judicial remedy vindicating his constitutional right to be free from unreasonable searches and seizures merely because the Constitution did not explicitly provide for our judicial review or because the Legislature had not expressly allowed us to deploy the remedy we selected to vindicate the defendant's constitutional rights.

Notwithstanding the aforementioned opinions of this Court indicating that the Judiciary is not prohibited from providing monetary or other forms of relief for constitutional violations until the Legislature states that we are empowered to do so, defendants here

---

**45.** *See Annicelli v. Town of South Kingstown,* 463 A.2d 133 (R.I.1983) (allowing inverse condemnation cause of action when governmental restrictions deprive property owner of all beneficial uses of his property without just compensation); *E & J, Inc. v. Redevelopment Agency of Woonsocket,* 122 R.I. 288, 293–95, 405 A.2d 1187, 1190–91 (1979) (recognizing viability of inverse condemnation theory but finding particular complaint insufficient to state a claim).

**46.** *See also First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 316 n. 9, 107 S.Ct. 2378, 2386 n. 9, 96 L.Ed.2d 250, 264 n. 9 (1987) (recognizing a just-compensation claim directly under the Federal Constitution as self-executing); *Harris v. Town of Lincoln,* 668 A.2d 321, 327–28 (R.I.1995) (private cause of action under article 1, section 16, when the plaintiff establishes direct taking of specific property and a concomitant physical invasion, so long as facts do not amount merely to a simple nuisance).

contend that this Court should refrain from providing a remedy for plaintiffs, relying heavily on this Court's established proposition that "the creation of new causes of action is a legislative function." *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I.1996) (no private cause of action for public authority's alleged noncompliance with public works bonding statute because General Assembly "could easily have exercised its power to create a cause of action * * * but it chose not to do so"); *see also Ferreira v. Strack*, 652 A.2d 965 (R.I. 1995); *Kalian v. People Acting Through Community Effort, Inc.*, 122 R.I. 429, 408 A.2d 608 (1979). However, defendants' reliance on the *Accent Store Design, Inc.* line of cases is decidedly misplaced when, as here, a constitutional violation is alleged.[47]

The analysis in this case is predicated on the existence of an affirmative constitutional right that is expressly given to crime victims and not merely on an alleged but unexpressed "right" created by extrapolation from another party's statutory duty. The statute at issue in *Accent Store Design, Inc.* did not confer any positive right upon the plaintiff subcontractors; rather, it only placed an express duty on governmental authorities who awarded public works contracts to require the posting of a bond. Moreover

the bonding requirement was not inextricably tied to any constitutional right. In the case at bar the victims possess an affirmative constitutional right by virtue of article 1, section 23, over and beyond any express statutory rights afforded them under the Victim's Bill of Rights Act. Further, as previously noted, the constitutional right here necessarily builds upon and incorporates those earlier-enacted statutory rights. For these reasons, the *Accent Store Design, Inc.* decision and other statutory-based line of cases are inapplicable to the judicial enforcement of constitutional rights.[48]

The case at bar also differs from the line of decisions of this Court refusing to imply a monetary cause of action to enforce a statutory provision when other remedies for its violation were provided for by the Legislature. *See, e.g., Pontbriand v. Sundlun*, 699 A.2d 856 (R.I.1997); *In re John*, 605 A.2d 486 (R.I.1992); *Citizens for Preservation of Waterman Lake v. Davis*, 420 A.2d 53 (R.I. 1980) (*Citizens II*). Those cases deal strictly with statutory rights, as opposed to constitutional ones. Where the former are involved, this Court has often deferred to the Legislature when the statute is clear and unambiguous in providing for other types of relief. Unlike statutory rights, however, constitutional rights express the will of the People

---

**47.** Because this case deals with constitutional rights and obligations, it is readily distinguishable from *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223 (R.I.1996) and its progeny.

"Statutory rights and obligations are established by [the Legislature], and it is entirely appropriate for [the Legislature], in creating these rights and obligations, to determine in addition, who may enforce them and in what manner. * * *

"The Constitution, on the other hand, does not 'partake of the prolixity of a legal code.' *McCulloch v. Maryland*, [17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819)]. * * * And *in* 'its great outlines,' ibid., the judiciary is clearly discernible as the primary means through which these rights may be enforced. * * *

"At least in the absence of a 'textually demonstrable constitutional commitment of [an] issue to a coordinate political department,' Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), we presume that justiciable constitutional rights are to be enforced through the courts. And, unless such rights are to become merely precatory, the class of those

litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights ." *Davis v. Passman*, 442 U.S. 228, 241–242, 99 S.Ct. 2264, 2275, 60 L.Ed.2d 846, 860 (1979) (holding that a direct cause of action for monetary damages exists against federal government officials for alleged Fifth Amendment violations despite the lack of any express provision in the Federal Constitution or federal statutory law creating such a remedy). (Emphases added.)

**48.** I also note that *Ferreira v. Strack*, 652 A.2d 965 (R.I.1995), and *Kalian v. People Acting Through Community Effort, Inc.*, 122 R.I. 429, 408 A.2d 608 (1979), which defendants cite to buttress their deference-to-the-Legislature argument, are inapposite here because in those cases we were asked to create a cause of action by either *extending* or *altering* the common law where (unlike here) no statutory *or* constitutional rights existed.

and are to be protected from alteration by the will of legislative majorities.[49] In addition, in those cases the Legislature had provided adequate alternative remedial schemes to vindicate the particular rights at issue. See *Pontbriand*, 699 A.2d at 868; *In re John*, 605 A.2d at 488; *Citizens II*, 420 A.2d at 57. In the case at bar, however, crime victims whose statutory and constitutional rights have been ignored are left without any remedy whatsoever since the Legislature has not acted to give victims remedial protection when they are deprived of their entitlement to address the court before sentencing or the acceptance of a plea bargain.

I also do not believe that G.L.1956 § 12–28–7[50] can be relied upon for the proposition that the Legislature was well aware of the existing governmental noncompliance with the statutory rights it created for crime victims, yet it still chose not to provide such victims with a cause of action for damages. It is of critical importance to note that § 12–28–7 purports to preclude only one type of potential relief that otherwise may have been judicially available for felony-crime victims, namely, the vacating of an otherwise lawful conviction or the voiding of an otherwise lawful sentence or parole determination. Thus the very existence of § 12–28–7 conclusively establishes that—notwithstanding the absence of an express private right of action in either the State Constitution or the Victim's Bill of Rights legislation—the General Assembly must have intended and expected that crime victims would still be able to file lawsuits and to obtain relief against those persons and entities that denied them their rights as crime victims. The reason this is so is that if the Legislature had no such intention or expectation, it would have no need or reason to enact a law excluding just one type of relief (the vacating of felony sentences, convictions, and parole determina-

tions) from the full panoply of judicial remedies otherwise available to crime victims.

I submit that the General Assembly's enactment of § 12–28–7 makes no sense whatsoever if it had truly intended to exclude crime victims from obtaining all types of judicial relief. Rather, the more logical interpretation of § 12–28–7 is that, knowing full well that if it failed to exclude a particular remedy such relief would otherwise still be available to crime victims, the General Assembly decided to do so and enacted § 12–28–7 to take away just this one remedial option from the courts. If the General Assembly and/or the framers truly had intended to prevent all crime victims from having any cause of action for monetary damages, it would have been a simple matter for them to say so expressly, either in the Constitution itself or in § 12–28–7, by inserting the language that other states have used in their constitutions (cited by the majority in footnote 6 of its opinion) when they wished to bar such relief altogether. But neither the framers nor the General Assembly chose to do so, thereby indicating that they did not wish to bar such a cause of action. What § 12–28–7 shows is that when the General Assembly wanted to prevent courts from awarding particular kinds of relief to crime victims, it knew how to do so. But conspicuously absent from the statute's terms is any preclusion of a monetary-damages award or of any other type of judicial relief for the violation of crime victims' rights except the vacating of felony convictions, sentences, and parole determinations. Accordingly I conclude that the General Assembly had no intention by its silence to bar the courts from awarding such traditional legal and equitable remedies.

### 2. *Federal Bivens Doctrine and Implied Causes of Action*

In the review of the Bandonis' claim for relief under the Rhode Island Constitution, it

---

**49.** See The Federalist No. 78, at 527 (Alexander Hamilton) (Jacob Cooke ed. 1961) (Federalist No. 78).

**50.** General Laws 1956 § 12–28–7 reads as follows: "Failure to afford the victim of a *felony offense* any of the rights established by this chapter shall not constitute grounds for vacating an otherwise lawful conviction, or for voiding an otherwise lawful sentence or parole determina-

tion." (Emphasis added.) I first observe that this statute is inapplicable on its face to the case at bar since the crime here was not a felony offense but rather a misdemeanor. Thus § 12–28–7 would be no bar to the vacating of the criminal defendant's conviction or to the voiding of his sentence as part of the potential relief otherwise available to the Bandonis if they were able to prevail on the merits of their claims.

is useful to look to the federal courts, which have repeatedly addressed the question of whether the Federal Constitution is judicially enforceable without any express prior legislative or constitutional authorization. Central to their discussion has been the development and refinement of the doctrine arising from the landmark federal decision of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and its progeny.

I acknowledge at the outset that we are not bound by the *Bivens* rationale because the Rhode Island Constitution is an independent source of rights. Nevertheless I deem its rationale to be directly relevant to the question of *our* judicial power to implement a cause of action vindicating the victims' rights provision in our State Constitution. In addition I observe that *Bivens* and its progeny confirm the unquestionable power of the Judiciary to entertain causes of action for *monetary* damages for alleged constitutional violations (hereinafter *Bivens* actions). But for the same reasons discussed previously, I note again that in the case at bar this Court is not so limited to recognizing a cause of action just for monetary damages.

In *Bivens* the United States Supreme Court held that a plaintiff alleging violations of his Fourth Amendment rights was entitled to sue federal officials in federal court and to obtain monetary damages if he were to prevail. 403 U.S. at 397, 91 S.Ct. at 2005, 29 L.Ed.2d at 627. In so holding, the Court observed that the Judiciary had both the authority and the responsibility to "be alert to adjust [its] remedies so as to grant the necessary relief" when constitutionally protected rights have been trammeled. *Id.* at 392, 91 S.Ct. at 2002, 29 L.Ed.2d at 624 (quoting *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939, 944 (1946)). A damages remedy was held to be appropriate because it was the only possible remedy for the plaintiff. *Bivens*, 403 U.S. at 410, 91 S.Ct. at 2011–12, 29 L.Ed.2d at 634–35 (Harlan, J., concurring) (noting that "[f]or people in Bivens' shoes, it is damages or nothing"). Injunctive relief would not have obviated the invasion of Bivens' Fourth Amendment rights, and application of the exclusionary rule (itself a judicially created remedy for constitutional violations) was inappropriate since they were not raising the alleged constitutional violations as a defense to a criminal prosecution. *Id.*

In his concurrence Justice Harlan addressed the power of the Judiciary to remedy the violation of federal constitutional rights. First, he rejected the notion that the Judiciary was powerless to permit damages remedies "to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of the popular will." *Id.* at 403–04, 91 S.Ct. at 2008, 29 L.Ed.2d at 631. Justice Harlan also deemed it the Judiciary's role to safeguard and enforce the Bill of Rights. He dismissed the notion that the Judiciary must first wait for legislative action, positing that constitutional rights are to be protected absolutely from the will of legislative majorities.

"[T]he judiciary has a particular responsibility to assure the vindication of constitutional interests such as those embraced by the Fourth Amendment. To be sure, 'it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.' * * * *But it must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities; at the very least, it strikes me as no more appropriate to await express congressional authorization of traditional judicial relief with regard to these legal interests than with respect to interests protected by federal statutes.*" *Id.* at 407, 91 S.Ct. at 2010, 29 L.Ed.2d at 633. (Emphasis added.)

Finally, Justice Harlan rejected the suggestion that administrative or budgetary considerations could potentially override the judicial power to protect constitutional rights—that is, that the Court should disallow a private damages action because increased expenditure of judicial resources would be necessitated by a new class of constitutional litigation. *Id.* at 410, 91 S.Ct. at 2012, 29 L.Ed.2d at 635. He cautioned that limita-

tions upon the effective functioning of the courts "should not be permitted to stand in the way of the recognition of otherwise sound constitutional principles." *Id.* at 411, 91 S.Ct. at 2012, 29 L.Ed.2d at 635.

After *Bivens* the United State Supreme Court twice recognized a cause of action for monetary redress directly under the United States Constitution. *See Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (violation of Eighth Amendment's right to be free from cruel and unusual punishment); *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (violation of Fifth Amendment's Due–Process Clause). In particular, I find *Davis* illuminating for its discussion of the Judiciary's role in the enforcement of constitutional, as opposed to merely statutory, rights.

In *Davis* the United State Supreme Court rejected the Fifth Circuit's use of a multifactor test previously laid out by the Court for determining whether a private cause of action can be implied from a federal statute. 442 U.S. at 232–33, 99 S.Ct. at 2270, 60 L.Ed.2d at 854. The Court found that "the question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution." *Id.* at 241, 99 S.Ct. at 2275, 60 L.Ed.2d at 860. Statutory rights and obligations are established by Congress, thus making it entirely appropriate for Congress to determine additionally the appropriate means of enforcement. *Id.* In statutory-right cases the correct approach is thus whether the legislative intent informing the particular statute would permit a cause of action. However, the *Davis* Court emphasized that the analysis differs when constitutional rights are involved because the Judiciary is presumed to be the primary means by which constitutional rights are to be enforced. *Id.*

The bedrock role of the Judiciary in enforcing constitutional rights also finds firm support in the origins of the Federal Constitution. When James Madison presented the Bill of Rights before Congress, he observed:

"[If the Bill of Rights is] incorporated into the constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the legislative or executive; they will be led naturally to resist every encroachment upon rights expressly stipulated for in the constitution by the declaration of rights." 1 Annals of Congress 439 (1789); *see also* Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* 335 (1996) (quoting Madison's speech in the House of Representatives, June 8, 1789).

In his examination of the proposed federal government's judicial department, Alexander Hamilton declared the Judiciary to be the "faithful guardians of the Constitution," protecting it against "legislative invasions * * * instigated by the major voice of the community." The Federalist No. 78, at 528 (Alexander Hamilton) (Jacob Cooke ed.1961). Hamilton wrote that, as "bulwarks of a limited constitution against legislative encroachments," the Judiciary is to protect against those situations wherein "the representatives of the people, whenever a momentary inclination happens to lay hold of a majority of their constituents incompatible with the provisions in the existing constitution, [act] in violation of those provisions." *Id.* at 527.

As did Madison and Hamilton, I believe that the power of the Judiciary to enforce constitutional rights is part of its checking function against unconstitutional encroachment by other political branches. *See also Marbury,* 5 U.S. (1 Cranch) at 178, 179 (finding that courts must declare as void acts repugnant to the Constitution and must neither "close their eyes on the constitution" nor allow "constitutional principle to yield to the legislative act"). Moreover, it is unquestionably the province of the Judiciary to fashion an adequate remedy when, as here, there is a legal right and that right has been violated. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Id.* at 163; *see also* R.I. Const. art. 1, § 5 ("[e]very person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which may be received in one's per-

son, property, or character"). Thus the recognition of a damages remedy in the case at bar is not only consistent with traditional notions of what it means to exercise the judicial power, but it would also be an abdication of our constitutional duty not to recognize such a legal claim because otherwise the Bandonis would be left remediless.

The majority concludes its *Bivens* analysis by referring to several opinions of the United States Supreme Court decided subsequent to *Davis* and *Carlson*, all of which further explored the Court's pronouncement in *Bivens* that a plaintiff's right to sue for monetary damages directly under the Constitution could be defeated when there are alternative remedies or special factors counseling hesitation. Remarkably though, the majority neglects to indicate that none of these decisions has any applicability to the facts of this case. Recognizing a constitutional right of action in the case at bar is fully consonant with the reasoning proffered by the Supreme Court in those cases for refusing to allow *Bivens* suits. Indeed those cases are easily distinguishable from the case at bar because of the presence there of special factors counseling hesitation. In sum those cases involved situations in which (1) complex and well-considered administrative remedial schemes already existed to provide meaningful remedies to injured parties such as the plaintiffs,[51] (2) Congress's plenary authority over the military, including its constitutional authorization to make rules governing the military establishment, and

the military's unique disciplinary structure weighed in favor of judicial deference to the Legislature,[52] or (3) an attempt to expand the category of defendants against whom *Bivens* actions may be brought (to include federal *agencies* as well as federal *agents*) would have undermined Congress's prerogative to make decisions involving federal fiscal policy.[53]

I discern no special factors counseling hesitation in recognizing a damages remedy here. The Victim's Bill of Rights Act creates no remedial mechanism for victims injured by the government's failure to give them their mandated notice. Although the victim does possess certain other remedies for injuries directly resulting from the acts constituting the criminal offense,[54] these potential alternative remedies address injuries different from the ones about which the Bandonis complain. Compensation or other relief for injuries the Bandonis may have sustained as a result of defendants' failure to provide them with notice and the opportunity to address the court before sentencing are distinct and separate from any remedies that they may possess for the original criminal harm they suffered. Thus, unless this Court allows the Bandonis to maintain a lawsuit for the violation of their constitutional rights as crime victims, they are remediless and their rights to address the court before sentencing are not only unenforceable but meaningless.

**51.** *See Schweiker v. Chilicky*, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (no direct action for damages because, even though complete relief was not available to the plaintiffs, an elaborate remedial scheme devised by Congress already provided meaningful safeguards and remedies to those harmed by delays in receipt of Social Security benefits); *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (inappropriate to allow nonstatutory-damages remedy when a comprehensive federal civil service scheme enacted after Congress' careful attention to various policy considerations already included procedural and substantive provisions giving meaningful remedies to those demoted in retaliation for protected speech).

**52.** *See Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (the unique disciplinary structure of the military and Congress's activity in the field constitute "special factors" that require judicial abstention in pro-

viding enlisted military personnel a *Bivens* remedy against their superior officers); *see also United States v. Stanley*, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (same).

**53.** *See Federal Deposit Insurance Corp. v. Meyer*, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (inappropriate to extend the availability of *Bivens* suit to include suits against federal agencies because, even if proper, the potentially enormous financial burden for the federal government in significantly expanding government liability was a special factor counseling hesitation).

**54.** *See, e.g.,* G.L.1956 § 12–25–10 (civil remedy against the criminal offender for compensation for personal injury); § 12–28–5 (civil judgment against criminal defendant upon final conviction of felony after jury trial); § 12–28–5.1 (court-ordered financial restitution from the defendant).

### 3. Recovery for Constitutional Violations in Other States

Several of our sister state supreme courts have also grappled with the question of whether monetary relief is available for state constitutional violations notwithstanding the absence of an express statutory remedy for such violations. However, none has addressed this issue in the context of an alleged violation of a victims' rights constitutional amendment.[55]

Many of the courts in our sister jurisdictions have not strayed far from the *Bivens* doctrine. The common approach has been to focus on the presence or absence of an existing alternative remedy that would provide some form of relief to the injured party when considering whether *Bivens* suits are available for violations of rights guaranteed under a state's declaration of rights.[56] Other state courts have used an analytical approach involving a multiple-step inquiry. *See, e.g., Rockhouse Mountain Property Owners Association, Inc. v. Town of Conway*, 127 N.H. 593, 503 A.2d 1385, 1388 (1986) (Souter, J.) (determining first whether the plaintiff's asserted interest deserves legal recognition and, if so, whether the relief requested would be an appropriate way to recognize that interest); *Shields v. Gerhart*, 163 Vt. 219, 658 A.2d 924, 927 (1995) (determining first

whether the specific constitutional provision is self-executing and, if so, whether monetary damages provide the appropriate remedy in light of the existence of any alternative remedial scheme).

I believe that a multi-step inquiry in the mold of *Shields* and *Rockhouse* is the proper approach for determining whether monetary or other forms of relief are available for a plaintiff injured by a violation of a Rhode Island constitutional provision. First, a court should address whether there has been an alleged violation of a state constitutional provision. Next, it should determine whether the plaintiff possesses a legal entitlement to relief for this particular violation. Accordingly the court should determine whether the Judiciary has the power to authorize a cause of action for the particular plaintiff at bar— that is, whether the constitutional provision is self-executing for this type of litigant. Finally, assuming the finding of a violation of a self-executing constitutional provision, then a court must ascertain the proper remedy. It "cannot address the question of [its] ability to award a particular remedy until it determines that the harm to be remedied is legally cognizable and declares the government action unconstitutional." Susan Bandes, *Reinventing Bivens: The Self–Executing Constitution*, 68 S. Cal. L.Rev. 289, 302–03 (1995).

55. All states have passed laws concerning the rights of crime victims, but at least twenty-nine states have also passed constitutional amendments protecting the same. *See* National Victim Center, *Rights of Victims*, http://www.nvc.org/nssearch/info 1, at 1. Of these twenty-nine states, at least twenty-one have explicitly left enforcement of victims' rights to the Legislature. However, Rhode Island is part of a smaller group of states that is silent in regard to a victim's remedy for violation of his or her enumerated rights and to which branch of government has enforcement authority. None of these states in the latter group have yet addressed whether a victim nevertheless possesses a constitutional claim in the absence of any legislative action.

56. *See, e.g., Gay Law Students Association v. Pacific Telephone and Telegraph Co.*, 24 Cal.3d 458, 156 Cal.Rptr. 14, 595 P.2d 592, 602 n. 10 (1979) (direct right of action under state equal-protection clause because the absence of any administrative remedy "provides no justification for the judiciary to fail to enforce individual rights under the state Constitution"); *Kelley Property Development v. Town of Lebanon*, 226 Conn. 314, 627

A.2d 909, 922 (1993) (no cause of action under state due-process clause because Legislature had provided reasonably adequate statutory remedy); *Widgeon v. Eastern Shore Hospital Center*, 300 Md. 520, 479 A.2d 921, 930 (1984) (common-law action for damages available to enforce violation of state's constitutional equivalents of the Federal Fourth and Fifth Amendments); *Brown v. State of New York*, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1138–39 (1996) (recognizing private right of action for monetary damages under New York's constitution for alleged violation of state constitutional rights to equal protection and freedom from unreasonable searches and seizures); *Corum v. University of North Carolina*, 330 N.C. 761, 413 S.E.2d 276, 290 (1992) (direct right of action under state constitution's free-speech clause because common law guarantees such relief where no other remedy exists); *Provens v. Stark County Board of Mental Retardation & Developmental Disabilities*, 64 Ohio St.3d 252, 594 N.E.2d 959, 965–66 (1992) (no private cause of action to redress alleged violation of free-speech clause because "there are other reasonably satisfactory remedies provided by statutory enactment and administrative process").

#### 4. *Why The Victims' Rights Amendment Is Self-Executing*

Applying the approach outlined above to the case at bar, I first consider whether there was a constitutional violation. Here the Bandonis allege that defendants deprived them of their constitutional and statutory rights as crime victims by, among other things, failing to provide them with a presentencing opportunity to address the court. In particular they were not, as required by article 1, section 23, given notice by defendants *before sentencing* of their right to address the court concerning the impact of the criminal defendant's conduct upon them. In addition they were not, as required by the Victim's Bill of Rights Act, informed of their rights to address the court prior to the criminal defendant's nolo contendere plea, to be apprised of the disposition of criminal defendant's case, to request restitution as an element of the case's final disposition, or to provide a written victim's-impact statement in connection with the criminal defendant's plea bargaining. I thus conclude that the Bandonis' complaint sufficiently pleads a constitutional violation.

I next consider four criteria in determining whether article 1, section 23, is self-executing: (1) whether the constitutional provision describes a right in sufficient detail to be enjoyed, protected, and enforced as opposed to merely expressing general principles; (2) whether the provision contains a specific directive to the General Assembly requiring further legislative action for implementation; (3) whether the constitutional history of the provision indicates the framers' intended effect; and (4) whether self-execution harmonizes with the scheme of rights laid out in the Rhode Island Constitution as a whole. *See Shields,* 658 A.2d at 928–29 (ultimately concluding that no cause of action under state

due-process clause because clause was not self-executing).

First, article 1, section 23, certainly is not limited to general principles or philosophical truisms. Although it provides that agents of the state shall treat crime victims with "dignity, respect and sensitivity during all phases of the criminal justice process," R.I. Const. art. 1, § 23, it also establishes a *specific* individual right to be able "[b]efore sentencing * * * to address the court regarding the impact which the perpetrator's conduct has had upon the victim." *Id.* And the preamble to article 1 declares this right—like the others enumerated in our Declaration of Certain Constitutional Rights and Principles—to be "essential and unquestionable" and "of paramount obligation." R.I. Const., art. 1 preamble.[57]

The majority's rationale for concluding that the constitutional right of crime victims to address the court before sentencing fails the first prong of the self-execution test is worthy of particular scrutiny because it is riddled with contradictions, nonsequitors, and objectively erroneous statements about the effect of the victims' rights amendment on pre-existing statutory law. First, we are told that crime victims' right to address the court before sentencing is not self-executing because "the framers chose to model the victims' rights amendment from the broad contours of § 12–28–2's Legislative Purpose provision *knowing full well that other sections within chapter 28 contained more specific rights as well as the means by which these rights may be enjoyed and protected* ." (Emphasis added.) We are then told that this supposed fact "is highly persuasive to [the majority's] conclusion that article 1, section 23, espouses only general principles and is therefore not self-executing." The problem with this contention, as the majority well

---

**57.** *The majority conspicuously omits this latter right when it argues that the constitutional framers "chose to model" the victims' rights amendment after the broader Legislative Purpose provision of the Victim's Bill of Rights Act, which (unlike article 1, section 23) neither places a specific right to address the court in the hands of a victim nor details when this right may be enjoyed. Compare § 12–28–2 ("the general assembly declares its intent to ensure * * * [t]hat the full impact of the crime upon the victim is* brought to the attention of the court") *with* R.I. Const. art. 1, § 23 (*"[b]efore sentencing, a victim shall have the right* to address the court regarding the impact which the perpetrator's conduct has had upon the victim"). (Emphasis added.) In light of these critical distinctions it is baffling to me how the majority can claim that after "the most rudimentary comparison," that "the only discernible difference is that article 1, section 23, is expressed in mandatory terms."

knows, is that the portion of the victims' rights amendment giving crime victims the specific right to address the court before sentencing is *not* included in "the broad contours" of § 12–28–2's "Legislative Purpose" provision but is instead based upon one of those "other sections within [the Victim's Bill of Rights statute that] contained more specific rights, as well as the means by which these rights may be enjoyed and protected." The majority itself then points to § 12–28–3(a)(11), as enacted by P.L.1983, ch. 265, § 1, and § 12–28–4, as "providing the precise procedures by which crime victims can exercise their right to address the court before sentencing." Accordingly, far from embodying the unenforceably "broad contours" of a legislative purpose provision, the majority concedes that the constitutional language allowing for crime victims to address the court before sentencing contains all the requisite specificity needed for such a clause to be self-executing because it is modeled on the specific statutory provisions "providing the precise procedures by which crime victims can exercise their right to address the court before sentencing." Nonetheless, we are still told by the majority that on the one hand article 1, section 23, is not self-executing because it was modeled on the broad contours of the legislative purpose provisions of the pre-existing Victim's Bill of Rights

Act, and yet we are also told on the other hand that because this specific right to address the court was already included elsewhere in the Victim's Bill of Rights Act, this proves that article 1, section 23, was not intended to be self-executing. The majority attempts to have it both ways, but its legal analysis simply cannot withstand scrutiny.[58]

The majority next claims that "a closer inspection of the statute's General rights provision" shows that crime victims "had *already* been given the right to address the court prior to sentencing three years *before* article 1, section 23, was ever ratified." Indeed, the majority erroneously contends that "article 1, section 23, provides crime victims with no additional rights beyond those promulgated by the General Assembly in 1983." But in 1983 crime victims were only given the right to address the court before sentencing "in those cases where the defendant has been adjudicated guilty following a trial by jury." *See* P.L.1983, ch. 265, § 1. Article 1, section 23, provided crime victims with additional rights (beyond those given in 1983) to address the court after guilty verdicts in nonjury trials and even in those cases when there is no trial at all because the defendant has pled guilty, pled nolo contendere, or is being sentenced after a plea bargain of some sort.[59] Accordingly, contrary to the majori-

---

**58.** The majority's repeated reference to the Legislature's labeling of the statutory right to address the court before sentencing as a "general right," *see* § 12–28–3, does not persuade me that the constitutional right contained in article 1, section 23, does no more than express general principles. Not only does this focus belie the very substance of the right contained in article 1, section 23, but it flies in the face of the majority's own characterization of the rights contained in § 12–28–3 as containing "more specific rights" than those broadly described in the legislative purpose provision. Moreover those "more specific rights" detailed in § 12–28–3 were not labeled "general rights" at the time of the 1986 Constitutional Convention but rather were titled "Rights of the victims during investigation and prosecution of the crime" until the General Assembly revised the section heading in 1994. *See* P.L.1994, ch. 187, § 1. In any event, as discussed earlier, I believe that article 1, section 23, necessarily incorporates the various rights contained in the Victim's Bill of Rights Act. Thus, to the extent that § 12–28–4 "provided the *precise means by which this particular right* [in § 12–28–3] may be enjoyed" (as the majority posits), the

victims' presentencing right-to-address-the-court clause in article 1, section 23, is certainly not expressed in the general terms of a mere philosophical truism. (Emphases added.)

**59.** Indeed, article 1, section 23, was part of the continual broadening of a crime victim's right to address the court between the original enactment of the Victim's Bill of Rights Act's in 1983 and the ratification of our State's new Constitution in 1986. *See* P.L.1985, ch. 411, § 1 (expanding presentencing right to address the court from cases where the defendant has been adjudicated guilty of a felony following a *jury trial* to those where there is an adjudication of guilt of a felony following *a trial*); P.L.1986, ch. 405, § 1 (further broadening presentencing right to address the court to include adjudications of guilt for *a crime* after a trial; extending a crime victim's right to address the court prior to acceptance of plea negotiation and imposition of sentence from cases involving a felony crime and felony crimes reduced to misdemeanors to cases involving *a crime;* eliminating limitation of specifically enumerated rights in § 12–28–3 to victims of felony

ty's erroneous statements, article 1, section 23, did indeed provide crime victims with additional rights beyond those that had been promulgated by the General Assembly in 1983, and it did so with more than the specificity required for this clause to be self-executing, especially when its particular provisions are compared to the relatively general due-process, just-compensation, cruel-and-unusual-punishment, and equal-protection provisions in the United States Constitution that have already been declared to be self-executing.

Second, article 1, section 23, contains no directive to the General Assembly for further enabling legislation pertaining to the right of crime victims to address the court before sentencing. This lack of an express legislative directive weighs heavily in favor of a conclusion that this portion of article 1, section 23, is self-executing, given the specificity of the enumerated right and the constitutional history of the provision.

The third criterion of the self-execution analysis calls for a review of the constitutional history of article 1, section 23. In construing constitutional amendments, we have as our primary purpose to give effect to the intent of the framers. *In re Advisory Opinion to the Governor (Ethics Commission)*, 612 A.2d 1, 7 (R.I.1992). In doing so, we properly consult extrinsic sources and "the history of the times." *Id.* at 7–8. A close review of the Constitutional Convention's contemporaneous documentary record reveals that the critical motivating force behind the victims' rights amendment was "the need

for greater protection for victims of crime." *See* Report of the Judiciary Committee Relating to Victims of Crime Resolution (86–140) 10 (Judiciary Committee Report), *reprinted in* Journal of the 1986 Constitutional Convention, Vol. 1, No. 8, at 10 (May 29, 1986) (Journal). Indeed, noting that victims' rights "should be made constitutional * * * to make then [*sic* ] more enduring," the Judiciary Committee for the 1986 Constitutional Convention expressly bemoaned the fact that the existing legislative enforcement scheme for victims' rights was "presently inadequate" and that its lack of enforcement provisions was a "major defect." *Id.* at 11.

A historical review of the 1986 Convention's handling of the victim's rights amendment shows that the framers in fact intended for victims to have enforceable rights in the courts after the amendment was adopted. Indeed the majority's declaration that it is the "undeniable conclusion" that the framers intended to condition a victim's right to legal recourse upon future legislative action is contrary to what is revealed in the primary sources I have examined.

The initial draft of the victims' rights amendment (Resolution 86–140) [60] expressly included an enforcement provision in addition to the specific rights identified therein: "These rights shall be enforceable by the victims of crime and they shall have recourse in the law for any denial thereof." This initial draft—including this recourse language—not only received approval from the Judiciary Committee [61] but was read in full

---

offenses so that the rights extend to victims of *criminal* offenses).

**60.** The initial draft was introduced to the Constitutional Convention on March 20, 1986, as Resolution 86–140, "A Resolution Relating to Victims of Crimes," and read as follows:

"Article 1, of the Rhode Island Constitution entitled, 'Declaration of Certain Constitutional Rights and Principles' is hereby amended by adding thereto the following section:

"Section 24. VICTIMS' RIGHTS.—All persons within this state who are victims of crime shall, as a matter of right, be treated with dignity, respect and sensitivity during all phases of the criminal justice process. Whenever possible, such persons shall receive financial compensation for their injuries or losses from

the perpetrator of the crime. They shall have the right to address the court regarding the impact which the perpetrator's conduct has had upon the victim. *These rights shall be enforceable by the victims of crime and they shall have recourse in the law for any denial thereof."* (Emphasis added.)

The explanation accompanying this resolution provided that its purpose was to "enumerate basic rights to be afforded victims of crime and *render[ ] those rights enforceable."* (Emphasis added.)

**61.** The Judiciary Committee met during May 1986 to consider three proposals relating to victims' rights, including Resolution 86–140. On May 7, 1986, the Judiciary Committee approved Resolution 86–140 by a ten to four vote, and subsequently referred it to the full constitutional

and passed resoundingly on the full floor of the Constitutional Convention.[62] After passage on the convention floor Resolution 86–140 was referred to the Committee on Style and Drafting, where its text was altered and the recourse language noted above was dropped. An annotated draft of the 1986 State Constitution contained in the original papers of the 1986 Constitutional Convention (and dated contemporaneously with the Committee on Style and Drafting's alteration of Resolution 86–140) reflects the various alterations of the committee and further indicates that the Committee on Style and Drafting merely *"clarified language"* in Resolution 86–140.[63] When Resolution 86–140 was returned in the following days to the full convention floor as amended by the Committee on Style and Drafting, it immediately thereafter obtained final passage by a vote of the delegates but only after the delegates were assured that the style committee's changes were made only "for the economy of language." *See* Proceedings at Constitutional Convention 62 (June 26, 1986) (Proceedings).[64]

Thus the minutes of the Constitutional Convention themselves reveal that the removal of the enforcement and recourse-in-the-law language from the initial draft was not intended to alter the *substantive meaning* of Resolution 86–140 as approved by the delegates and by the Judiciary Committee before it was referred to the Committee on Style and Drafting. Rather when the amended Resolution 86–140 was presented to the full constitutional delegation minus the enforcement and recourse language, its introduction was prefaced with this very telling remark: "This resolution on victim rights was *redrafted for the economy of language* and it now reads as follows." Proceedings at 62 (June 26, 1986). (Emphasis added.) The amendment was then read and it passed without any objection. Thus, it is clear that Resolution 86–140 was not amended with the intent to preclude victims from obtaining "recourse in the law for any denial" of their rights. Rather, it is evident that the framers voting for final passage did so under the assurance they received that the substantive meaning underlying the initial draft they had approved so overwhelmingly prior to the Committee on Style and Drafting's alterations was still intact—that is, that victims' rights still "shall be enforceable by the victims of crime and they shall have recourse in the law for any denial thereof." [65]

convention floor. *See* Report of the Judiciary Committee Relating to Victims of Crime Resolution (86–140) 4 (Judiciary Committee Report), *reprinted in* Journal at 10 (May 29, 1986).

**62.** On May 29, 1986, Resolution 86–140 was read to convention delegates and subsequently passed by a vote of eighty-seven to two. *See* Journal at 2 (May 29, 1986).

**63.** *See* Annotated Constitution of the State of Rhode Island and Providence Plantations at 12 (June 18, 1986). (Emphasis added.) This annotated edition of the Constitution reflects that the Committee on Style and Drafting merely intended to clarify the language of Resolution 86–140 on June 16, 1986, but did not intend to alter its substance. *See* Annotated Draft, Rhode Island Constitution of 1986, *included in* J. Jackson, compiler, *An Inventory of the Papers of the Rhode Island Constitutional Convention* (Providence College 1989).

**64.** On June 26, 1986, Resolution 86–140, as amended by the Committee on Style and Drafting, was read and then passed by the full Convention by a vote of ninety-three to one. *See* Proceedings at Constitutional Convention 95 (June 26, 1986).

**65.** The majority places great reliance on *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685 (1st Cir.1994) (*Narragansett*), to support its conclusion that the "for the economy of language" statement on the convention floor should be disregarded as one individual framer's "planned remarks." I believe that the factual situation in *Narragansett* differs markedly from the events that took place with respect to article 1, section 23, and therefore, I fail to see the application of that case's principles to the situation here. First, unlike *Narragansett*, the statement in question here was directed to the *entire* constitutional delegation (and not merely to a handful of self-interested delegates) just moments before the vote for final passage. Second, this is not a case in which a couple of delegates sought specific assurances from a bill sponsor but rather one in which an entire delegation was given an *unsolicited* assurance from the president of the Constitutional Convention. Finally and significantly, unlike *Narragansett*, where the provision for which the two Senators sought assurance was deleted during floor debate of the entire Congress, the recourse-in-the-law language was deleted, not at the behest of the entire constitutional delegation but rather by a much smaller universe of individuals working in a style and drafting committee. Thus the case at bar simply does not implicate

To support its position, the majority relies upon language it excerpts from a Judiciary Committee report (published prior to final passage of the victims' rights amendment) to the effect that "specific provisions for enforcement [should be left] to the General Assembly." However, this commentary was directed to the draft Resolution 86–140 that *included* the explicit enforcement and recourse-in-the-law language previously discussed. Thus the committee's comments do not indicate an intention to preclude judicial relief but only that more specific enforcement provisions would be left to the Legislature.[66]

The majority also contends that when the Committee on Style and Drafting deleted the recourse-in-the-law language from Resolution 86–140, it did so by substituting the clause "and shall receive such other compensation as the state may provide." I disagree that there was any substitution of one clause for the other. Rather, the other-compensation clause was inserted in that part of the victims' rights amendment concerning the financial compensation that crime victims shall be entitled to receive "for any injury or loss caused by the perpetrator of the crime." Thus the placement of this clause in that portion of the amendment's text (pertaining to crime victims' remedies for losses inflicted by the criminal) shows that that clause had nothing to do with that portion of the amendment concerning what compensation or other relief may be afforded to crime victims whose presentencing rights to address the court have been violated by the government.[67]

Next, even if the majority was correct in its conclusion that this other-compensation clause was intended by the framers to be substituted for the recourse-in-the-law clause in Resolution 86–140, there is even more reason to conclude that this substitution was not intended to effect a substantive change in the enforceability of the amendment. First, the fact that the language change occurred in the Committee on Style and Drafting rather than in the Judiciary Committee or in some other substantive committee of the Convention strongly suggests that it should be construed as a style change and not as a change in the substance of the amendment. Second, the delegates of the Convention were told before they voted on the amendment that the changes were "for the economy of language" and not for purposes of revising any substantive provision that they had already approved in passing Resolution 86–140. Third, and most significant of all, the text of the other-compensation clause is consistent with providing crime victims with a judicial remedy to compensate them for the violation of their constitutional right to address the court before sentencing of the criminal who injured them.

As much as the majority might be loath to admit it, the Judiciary is part of "the state" that is expressly referenced in this amendment. Thus the majority erroneously assumes that the words "other compensation as the state may provide" refers solely to what the General Assembly may enact as legislation. But when I last looked, both the Executive and the Judiciary were still branches of the state. Accordingly, especially when this matter is considered in light of what the amendment was intended to accomplish for crime victims and of the professed economy-of-language purpose for the Style and Drafting Committee's changes to Resolution 86–140, it appears to me that the insertion of the

---

the same concerns expressed in *Narragansett* in regard to those instances in which "nods and winks * * * may have been exchanged" between individual legislators and it appears that the full legislative body "simply had a change of heart" and agreed upon different language. *Narragansett*, 19 F.3d at 700.

**66.** *See also* Annotated Edition, Constitution of the State of Rhode Island and Providence Plantations 11 (Office of the Secretary of State, 1988) (indicating that the framers intended for the victims' rights amendment to *"mandate enforcement,* while leaving specific provisions or mechanisms to the determination of the general

assembly *and the courts* "); 1986 Rhode Island Constitution Annotated 23 (Rhode Island Law Institute, June 1987) (same). (Emphases added.)

**67.** Indeed, the voters' ballot guide put to the People of Rhode Island on election day on November 4, 1986 (to vote on the various constitutional revisions proposed by the framers) introduces the right to compensation from perpetrators for injury or loss and the right to speak in court before sentencing as *separate* guaranteed rights. *See* Voters' Guide to Fourteen Questions for Constitutional Revision 12 (Nov. 4, 1986).

other-compensation clause and the deletion of the recourse-in-the-law language were not intended to preclude the Judiciary from enforcing the victims' rights amendment without prior legislative approval to do so.

Moreover, a further review of the Judiciary Committee report reveals that the committee members did not intend to preclude victims from obtaining judicial relief for violation of their constitutional rights. In the report the committee noted that it was considering three different proposals for a victims' rights constitutional amendment. It ultimately decided to accept Resolution 86–140 (with its recourse-in-the-law language discussed above) because it "steers a middle course" between one proposal merely outlining a "simple right to be present and to be heard at all stages of judicial proceedings" and another more detailed proposal that (among other things) encouraged the establishment of community-based programs to rehabilitate offenders and provided for a victim's right to compensation within two months after his or her expenses or losses were incurred. *See* Judiciary Committee Report at 1, *reprinted in* Journal at 10 (May 29, 1986). Indeed, Resolution 86–140 staked a middle ground between these two other proposals because not only did it contain an explication of victim rights but—at that time—it also included a general enforcement provision without the more specific details of the third proposal. Because Resolution 86–140 already provided for victims' recourse in the law for any violation of their rights, the Judiciary Committee was merely providing that the General Assembly could refine and provide further enforcement mechanisms by which victims could seek recourse in the courts—a proposition that it had *already accepted* in approving Resolution 86–140.[68]

Thus this constitutional history strongly indicates that the framers' primary reason for enacting this amendment was to assuage concerns about the lack of enforcement for victims' rights under the existing statutory scheme and it shows that the amendment was adopted so that victims' rights "shall be enforceable by the victims of crime and they shall have recourse in the law for any denial thereof." Accordingly I believe that by denying a private right of action to crime victims, this Court is imposing remedial roadblocks to enforcement that were not contemplated by the framers and which have the effect of totally frustrating their avowed purpose in drafting this amendment—namely, to "mandate enforcement" of victims' rights.

Finally, with regard to the fourth and last criterion for determining whether article 1, section 23, is self-executing, I note that there are no other more specific provisions in the Rhode Island Constitution that provide the requisite protections for crime victims. *Cf. Shields,* 658 A.2d at 929 (finding state constitutional due-process clause was not self-executing because other constitutional provisions provided recourse for state interference with property rights). In fact, the proceedings of the 1986 Constitutional Convention reveal that the victims' rights amendment was enacted precisely because such rights could not be linked with any other existing constitu-

---

**68.** To bolster its position that the constitutional framers did not intend for victims' rights to be judicially enforceable, the majority points to "[a]n early version of a proposed constitutional amendment" containing an even more explicit enforcement provision than the recourse-in-the-law language of Resolution 86–140. However, to place this early version in context of the overall legislative history of article 1, section 23, I note the following. First, this "early version" was first presented to the Judiciary Committee by Robert Pirraglia, a delegate who was also a Rhode Island District Court judge. It was presented as part of public testimony received by that committee on May 6, 1986. This occurred *after* the introduction of Resolution 86–140. Second, although the majority correctly points out that this "early version" was "not ratified," there is no evidence in the constitutional record that it (*unlike* Resolution 86–140) was *ever* considered (much less passed) by the full delegation on the convention floor. Indeed, the "early version" cited by the majority was not even one of the three resolutions considered by the Judiciary Committee when it decided to accept Resolution 86–140 as "steer[ing] a middle course." Finally, Judge Pirraglia introduced this "early version" by testifying to the Judiciary Committee that it was a "sample" resolution and "that the precise words were not important." In fact, "[w]hen asked to review Resolution 86–140, he said it was fine." Thus the fact that the particular language of this "early version" never became the actual language of article 1, section 23, is hardly indicative, much less dispositive, of the framers' intentions.

tional provision. *See* Proceedings at 62 (June 26, 1986); Journal at 11 (May 29, 1986).

Having shown that article 1, section 23, is self-executing—that it was not intended to require any further action of the General Assembly before it would become enforceable—I next address the appropriate remedy here. Mindful that our duty is to review the Bandonis' complaint only to determine whether they have stated a cause of action for *some* form of relief, I observe that the Bandonis' ultimate entitlement to any remedy or remedies will depend on the facts of the case as they are developed at trial. If plaintiffs are successful, "[i]t will be a matter for the trial judge to craft the necessary relief." *Corum v. University of North Carolina*, 330 N.C. 761, 413 S.E.2d 276, 290 (1992). Moreover, some rights may require greater or lesser relief to rectify a constitutional transgression. *Id.* 413 S.E.2d at 291. Nevertheless, I conclude that fashioning a remedy for a constitutional violation is consistent with the Judiciary's general power to remedy violations of specific legal duties.

> "When a legislative [or constitutional] provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action." Restatement (Second) of Torts § 874A, at 301 (1979).

Indeed, "State Bills of Rights Provisions are exceptionally amenable to enforcement by a section 874A type action because they tend to be phrased as declarations either of positive rights or of limitations on government, but without simultaneously specifying a 'civil remedy' for their breach." J. Friesen, *State Constitutional Law: Litigating Individual Rights, Claims, and Defenses* § 7–5(c), at 420 (2d ed.1996) (footnotes omitted).

Accordingly I would not foreclose the possibility of a monetary-damages award to the Bandonis provided that they are able to establish that their damages were proximately caused by the alleged victims' rights violations.[69] However, as our sister state courts have done in *Shields* and *Rockhouse*, I think we should proceed cautiously in making such a determination, and I would not necessarily permit such relief if (unlike the situation here) the General Assembly had enacted an alternative remedial scheme or if there were any other factors counseling hesitation. I also note in passing that other forms of relief may be appropriate, based upon the facts alleged in the Bandonis' complaint.[70] How-

---

**69.** *See Owen v. City of Independence*, 445 U.S. 622, 651, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673, 693 (1980) (noting that "[a] damages remedy * * * is a vital component of any scheme for vindicating cherished constitutional guarantees").

**70.** For example, without deciding whether this would be appropriate here, I note the possibility of resentencing the criminal defendant after giving plaintiffs an opportunity to address the court regarding the impact that the criminal defendant's conduct had upon them. Jeopardy attaches upon the entry of a defendant's nolo contendere plea. *Nardone v. Mullen*, 113 R.I. 415, 418, 322 A.2d 27, 29 (1974). However, the United States Supreme Court has concluded that there is no double-jeopardy problem in resentencing a criminal defendant where there has been a technically improper sentence. *Bozza v. United States*, 330 U.S. 160, 165–67, 67 S.Ct. 645, 648–49, 91 L.Ed. 818, 821–22 (1947) (holding that the Federal Constitution "does not require that sentencing should be a game in which a wrong move by the judge means immunity for the prisoner"). "[T]o constitute a proper basis for the claim of former jeopardy a proceeding must be valid, and if the proceedings are 'lacking in any fundamental prerequisite which renders the judgment void' they will not constitute a proper predicate for such a claim." *Tilghman v. Mayo*, 82 So.2d 136, 137 (Fla.1955), *cert. denied*, 350 U.S. 942, 76 S.Ct. 317, 100 L.Ed. 821 (1956). Moreover, the United States Supreme Court has recently confirmed that the protections of the Double Jeopardy Clause do not extend to noncapital sentencing proceedings. *Monge v. California*, — U.S. —, 118 S.Ct. 2246, 2247, 141 L.Ed.2d 615, — (1998) (where California's "three-strikes" law permitted recidivism sentence enhancements upon proof beyond a reasonable doubt of the prior conviction allegations, the Double Jeopardy Clause did not preclude retrial vis-à-vis a noncapital sentencing proceeding on the prior conviction allegations). Although the criminal defendant is not a party to this action, he could be joined upon remand

ever, these are decisions that should be made in the first instance by the Superior Court. In short I believe that the Bandonis' complaint states a claim under our Constitution for which relief in the form of damages as well as other possible equitable remedies *may* be available, and I would remand this claim for further proceedings.

### C. *Viability of Plaintiffs' Negligence Cause of Action*

The Bandonis also seek relief based upon a common-law negligence theory. They claim that their complaint states a prima facie case for the breach of a duty owed them by defendants, which proximately caused the deprivation of their statutory and constitutional rights as victims. In response, defendants maintain that a negligence cause of action is inappropriate because it would be contrary to the Legislature's intent.[71]

It is well established in this state that the violation of a statute constitutes prima facie evidence of negligence. This evidence can be used as an aid to the trier of fact in determination of the negligence issue. *See, e.g., Brodeur v. Desrosiers*, 505 A.2d 418, 422 (R.I.1986); *Salcone v. Bottomley*, 85 R.I. 264, 267, 129 A.2d 635, 637 (1957); *Rossi v. Ronci*, 63 R.I. 250, 254, 7 A.2d 773, 775–76 (1939). Unlike some other states, in Rhode Island the violation of a statute is not conclusive evidence of negligence, nor does it create a presumption of a violation of a duty of care or relieve a jury of finding a breach of such a duty. *Rossi*, 63 R.I. at 254, 7 A.2d at 775–76;

see also *Paquin v. Tillinghast*, 517 A.2d 246, 248 (R.I.1986). However, in this state a statutory violation can be considered by the factfinder as evidence of negligence when the plaintiff demonstrates that he or she is a person whom the statute was designed to protect, *see Paquin*, 517 A.2d at 248, and that the harm that occurred was the kind of harm the statute was designed to prevent. Restatement (Second) of Torts § 286, at 25 (1965). But "if the injured person falls outside the protective orbit of the statute, his claim based on breach of a statutory duty of care will not be presented to the jury for no such duty was owed to him." *Paquin*, 517 A.2d at 248.

In reviewing our cases on this subject, I note that we have applied the statutory-violation-as-evidence theory to cases involving penal statutes, *see, e.g., id.* (motor vehicle statute imposing fine for violation), as well as to statutes not imposing any explicit penal sanction, *see, e.g., Rossi*, 63 R.I. at 254, 7 A.2d at 775 (workers' compensation act prohibiting employment of minors). Significantly, I observe that we have permitted plaintiffs to proceed with common-law negligence actions beyond the pleading stage when they are able to establish the violation of such statutes. The violation becomes prima facie evidence of liability, "which, unless rebutted by evidence in favor of the defendant, entitles the plaintiff to recover. If such rebutting evidence is introduced, the plaintiff is entitled to recover, if the evidence in favor of the

---

before determining whether resentencing would be an appropriate remedy.

**71.** The defendants also argue that they are immune from a negligence suit here. However, because a case in which the public-duty doctrine is asserted as a defense is not generally appropriate for disposition on a motion to dismiss for failure to state a claim made pursuant to Super. R. Civ. P. 12(b)(6), *see Haley v. Town of Lincoln*, 611 A.2d 845, 850 n. 1 (R.I.1992), this question is better left for a later day and should not be decided just on the pleadings. Nevertheless, even at this early stage of the proceedings I would simply note that this case does not appear to present a situation in which plaintiffs are "attempting to impose tort liability on judges and prosecution officers who enjoy immunity." Indeed, the Victim's Bill of Rights Act required employees of the victims' services unit to identify

victims of crime, to "inform them of their rights," to provide them with "[a]ssistance in preparing for and making court appearances and in making victim impact statements," and to give them "[n]otification about the status of their cases." Section 12–28–10(a). In *Calhoun v. City of Providence*, 120 R.I. 619, 390 A.2d 350 (1978), this Court held that the state was liable in tort for injuries arising from the failure of one or more of its judicial-department employees to perform similar ministerial functions imposed upon them by law. Thus, *Calhoun* would appear to support a finding that the Bandonis' claim should not be barred by the shield of governmental immunity. *Id.* at 633–34, 390 A.2d at 357 (no governmental immunity barred the plaintiff's claim for monetary damages when a negligent failure of the clerk's office staff to recall an outstanding capias warrant led to the plaintiff's mistaken arrest and incarceration).

plaintiff is of greater weight than the evidence in favor of the defendant on the question of liability." *Rossi*, 63 R.I. at 254–55, 7 A.2d at 776.

The common thread in these cases is that this Court has found a duty running from a defendant to an intended beneficiary plaintiff vis-à-vis a statute. *See, e.g., Sitko v. Jastrzebski*, 68 R.I. 207, 27 A.2d 178 (1942) (concluding that child tenant was in a class of plaintiffs intended to benefit from building-code regulations); *Rossi*, 63 R.I. at 253, 7 A.2d at 775 (finding that statute and its amendment demonstrate clear intent of Legislature to impose direct duty on employer not to permit a minor to work on certain machinery). Similarly, it is clear that victims of crime were the intended beneficiaries of the statutory notice and hearing provisions in the Victim's Bill of Rights Act. Two of the legislative purposes of that act were to treat crime victims with "dignity, respect, and sensitivity at all phases of the criminal justice process" and to ensure that "the full impact of the crime upon the victim is brought to the attention of the court." Section 12–28–2. Clearly when a crime victim is never notified of his or her rights enumerated in the act, its central purposes are eviscerated. Moreover, just as the building code in *Sitko* and the workers' compensation act in *Rossi* placed duties on landlords and employers, respectively, the Victim's Bill of Rights Act places an affirmative and special duty on defendants in the case at bar to notify victims of their enumerated rights.

I see no reason why the violation of a constitutional provision would not similarly provide the basis for a common-law negligence action. First, as previously discussed, the constitutional right under article 1, section 23, necessarily incorporates the rights and duties of the Victim's Bill of Rights Act. In addition, as the expression of the will of the People of Rhode Island, our state's Constitution is preeminent over statutory law. "[W]here a constitution asserts a certain right, or lays down a certain principle of law or procedure, its speaks for the entire people as their supreme law, and is full authority for all that is done in pursuance of its provisions." *Shields*, 658 A.2d at 927 (quoting

*Davis v. Burke*, 179 U.S. 399, 403, 21 S.Ct. 210, 212, 45 L.Ed. 249, 251–52 (1900)). Accordingly, just as I conclude that the absence of legislative action cannot nullify a crime victim's constitutional right, I also would hold that a violation of rights and duties delineated in our Constitution can equally serve as prima facie evidence of negligence.

## IV

### Conclusion

Accordingly for the above-stated reasons, I would vacate the judgment dismissing plaintiffs' claims and remand this case for further proceedings.

### APPENDIX A

**State of Rhode Island & Provincial Plantations**

**Providence, Sc.**

**Supreme Court**

**ROBERT J. BADONI, ET AL.**

**V.**

**ROBERT C. HARRALL, ET ALS.**

APPEAL No. 95–0563
**APPELLANTS' REQUEST TO CONSIDER ADDITIONAL WRITTEN ARGUMENT**

Now come the appellants and respectfully pray, in light of certain questions raised by the Court at oral argument as to the issue of damages and/or other remedies, that the brief supplemental argument, stated below, be considered, with sufficient time given to the appellees to respond, if they desire to do so.

**What is the appropriate remedy in the instant case for the vindication of these crime victim's rights?**

It is certainly within the authority of this Court to declare a remedy, short of an action for damages, whereby a crime victim may move, within a reasonable time, to reopen the criminal matter, to vacate the plea and sentence, and enjoy his or her constitutional right to be heard. In this particular case,

however, such a remedy is unavailing, and potentially dangerous.

1. Mr. & Mrs. Bandoni cannot be fully restored to their position at the time of the original sentencing. Once they lost the right to address the court, to seek restitution and to have a civil judgment entered against the criminal defendant they brought and settled their civil action for what little he had by way of insurance coverage, and executed a general release. Arguably, they have no right, now, to seek restitution from him without violating the terms of their settlement and release.

2. More than five (5) years has passed since the plea and sentence in this case. Remitting Mr. And Mrs. Bandoni to the remedy of having the criminal case reopened after all this time sets a poor precedent in terms of that which is a "reasonable" time in which future crime victims suffering this same deprivation of rights should act.

3. Any action by this Court now to impose such a remedy would undoubtedly be challenged as violative of the criminal defendant's state and *federal* protections against double jeopardy. Although this Court could effect an appropriate balance between the victim's and the criminal's *state* constitutional rights, there is no corresponding victims' rights amendment in the federal constitution against which to balance the criminal's Fifth Amendment rights. As a result, the Rhode Island Constitution, with its *additional* protections afforded to the victims of crime, could be viewed ultimately, and ironically, as a drier source of right than the federal constitution, and a puny thing by comparison. If the Court is to be confronted ultimately with the task of attempting to balance these conflicting rights, that task, certainly, should not be one of this Court's own making.

4. The application of a traditional tort/damages remedy against the state and municipal defendants is more consistent with the role of the judiciary, and well within its province. It is less invasive of the legislative function, and more responsive to merits of the single case now before the Court.

For these reasons, the right to maintain an action for damages against the state, municipal and individual defendants should be recognized as the only viable remedy in this particular instance. This is hardly a "radical" proposition. The Court is asked to make a sound, measured response to the facts of this case upon a reasonable interpretation of the state constitution and upon the application of well-settled principles. *Ubi jus, ibi remedium.* The recognition of traditional tort/damages remedy for this violation of the crime victim's rights would serve to maintain the integrity of our state constitution and to avoid conflict with other state and federally guaranteed rights until such time as the legislature chooses to act. Once the General Assembly does provide a remedy, a direct action such as this would be rendered obsolete.

It is traditionally recognized that wherever there is injury, damages follow. *Ubicunque injuria est, ibi damnum sequitur.* At trial, as matter of law, the judge may well decide that, as a reasonable district court judge with these victims before him, he would have ordered restitution as part of the original sentence. The jury, rather than the district court probation office, would then determine as a matter of fact the appropriate amount. By subtracting the net (after costs and attorneys fees) that Mr. & Mrs. Bandoni actually received in their civil settlement with the criminal defendant, the difference, if any, is the potential measure of damages. In addition, whereas the Court may decline to create a "Bivens" damages remedy to vindicate, otherwise, the loss of these crime victims' rights, it would seem that they are entitled, in the very least, to those nominal damages allowable at common law for their loss, as inadequate as that remedy may be.

Respectfully submitted this 10th day of October, 1997.

ROBERT J. BANDONI, and LORRAINE BANDONI, By Their Attorney.